**RAMSEY v. LEEPER et al.**

No. 20894.  Dec. 12, 1933.

Rehearing Denied April 17, 1934.

Allen & Jarman, for plaintiff in error.

A. G. Morrison & Sons, for defendants in error.

Eldon J. Dick, City Atty., E. M. Gallaher, Asst. City Atty., and Harve N. Langley, Special Counsel, amici curiae.

BUSBY, J. This is an appeal from the district court of Canadian county. The defendants in error were plaintiffs in the court below, and the plaintiff in error was defendant therein. When not otherwise designated, the parties will be referred to as they appeared before the trial court.

Plaintiffs commenced this action on October 22, 1928, seeking to recover a five-elevenths undivided interest in a 30-acre tract of land situated in Canadian county, Okla., and to procure a partition thereof. Plaintiffs concede the defendant, W. R. Ramsey, to be the owner of the other six-elevenths interest. The defendant, Ramsey, however, asserts ownership of the entire tract.

The tract of land involved herein is a part of an 82.79 acre tract which was appropriated by Oklahoma City through condemnation proceedings instituteed in the district court of Canadian county in 1917. The purpose of the condemnation was to procure the land to construct, erect, and maintain a waterworks system, together with all reservoirs, dams, conduits, machinery and equipment that might be necessary to supply water for Oklahoma City. This land had been the property of Hugh A. H. Leeper until his death in December of 1916. At the time of the condemnation proceedings above mentioned, the estate of Hugh A. H. Leeper was in the process of administration. The estate was not closed until the condemnation proceedings were completed. The plaintiffs are heirs at law and beneficiaries under the will of Hugh A. H. Leeper, being five of his eleven children, and as such each was entitled to a one-eleventh interest in his property subject to the payment of his just debts and funeral expenses and subject to a life estate in the property in question, which by the terms of the will was devised to his widow, Nancy Leeper, who departed this life during the process of the administration of the estate of Hugh A. H. Leeper.

The judgment in the condemnation proceedings recited that full value had been paid for the land in question and that a "fee simple" was conferred upon the condemnor. The money paid by the condemnor was received by John Leeper, as executor, and in the due course of administration it was properly distributed among the heirs and beneficiaries of the deceased.

It later developed that the exclusive use of the entire tract of land thus condemned was unnecessary for the purpose for which it was condemned, and the condemnor on April 25, 1928, pursuant to certain preliminary proceedings, executed a deed to the 30 acres in question to the defendant, W. R. Ramsey. Restrictive provisions were incorporated in the deed prohibiting the use of the property for general mercantile purposes and preventing the erection of more than one residence on any tract of less than five acres. The obvious purpose of such restrictive provisions being to prevent or minimize pollution and contamination of the water supply reservoir located in close proximity to the property.

No question is raised in connection with the manner in which the city disposed of the property. The question in this case is whether or not the city had acquired such an interest in, or title to, the land as would enable it to voluntarily alienate the same to a private individual. The defendant in this case has procured quit-claim deeds from six of the eleven devisees and heirs of Hugh A. H. Leeper, thereby narrowing this controversy to the remaining 5/11th interest.

It is the contention of the plaintiffs that the city of Oklahoma City, the condemnor, acquired only a right in the nature of an easement to use the land in question for the purposes for which it was condemned. That its right to enjoy this easement was contingent upon the continued use of the land for such purpose. That the sale or attempted sale of the land to the defendant constituted an abandonment of this use and that the right to possession of the land thereupon reverted to the heirs at law and devisees of Hugh A. H. Leeper, who, plaintiffs say, were at all times the owners of the fee-simple title, subject only to this easement which ceased on abandonment.

The defendant, on the other hand, asserts that Oklahoma City obtained a fee-simple title to the land in controversy, and that the deed executed to him by the city operated to transfer the same character of title to him, subject to the restrictions incorporated in the deed.

On the trial of this cause a jury was waived and the issues submitted to the court. Request was made for separate conclusions of law and fact, and in accordance

with this request findings of fact and conclusions of law appear in the record. We quote the conclusions of law which in the main correspond to the theory of the plaintiffs:

"1. That by the condemnation proceedings hereinabove referred to, the city of Oklahoma City acquired only an easement or the right to use the said tract of land for waterworks and did not acquire a fee-simple title.

"2. That the fee-simple title to the said tract of land, subject to the use of the city of Oklahoma City for waterworks purposes, was never divested from these plaintiffs and other heirs at law of Hugh A. H. Leeper, deceased.

"3. That upon the abandonment of the tract of land by the city of Oklahoma City for the use for which it was condemned, the right to possession of the said land reverted to the heirs at law of Hugh A. H. Leeper, deceased.

"4. That plaintiffs are not estopped from asserting their rights in and to said tract of land by their appearance in the proceedings of the district court had on the 4th day of May, 1917, nor by their acceptance of their proportionate part of the estate of Hugh A. H. Leeper, deceased, which included the condemnation money."

The defendant especially requested that in addition to the foregoing conclusion the trial court determine as a matter of law whether the statutes of the state of Oklahoma or the charter provision of Oklahoma City should govern in determining the right of the city to exercise the power of eminent domain. The trial court declined to determine this precise question, but concluded as a matter of law that the determination thereof was immaterial for the reason that neither the charter provisions nor the statutes of the state of Oklahoma would authorize the city to take a fee-simple title to the lands in question.

The judgment of the trial court was rendered on the 26th day of June, 1929, in accordance with the conclusion above set forth. Each of the five plaintiffs was adjudged to be the owner of an undivided one-eleventh interest in the land in question, and a partition thereof was ordered. This appeal is prosecuted to reverse the judgment thus rendered.

The principal question in this case is whether a city can acquire a fee-simple title in real estate for waterworks purposes by an exercise of the power of eminent domain through condemnation proceedings.

Before considering and disposing of this principal question, it is essential that the other preliminary question be disposed of.

The plaintiffs urge that the judgment of the district court of Canadian county in the original condemnation proceedings is not binding on them for the reason that in the petition therein filed they were not formally named as parties defendant. The record discloses that with the exception of John Leeper the plaintiffs were not named in the condemnation proceedings as parties defendant. However, the land in question does not appear to have been a probate homestead (in fact, it was agreed in the trial of this case that no homestead questions were involved), and the estate of Hugh A. H. Leeper was not closed until long after the judgment in the condemnation proceeding. The executor, John Leeper, having been made a party defendant in his representative capacity, was notified and entered a general appearance. Under such circumstances, the defendant urges that plaintiffs herein were not necessarily parties defendant, relying upon the authority of McClung v. Cullison, 15 Okla. 402, 82 P. 499. Bledsoe v. Green, 138 Okla. 15, 280 P. 301; Jamison v. Goodwin, 43 Okla. 154, 141 P. 767.

The condemnor evidently relied upon the reasoning of the foregoing authorities when it failed to name the heirs and devisees as parties defendant. Assuming, however, the plaintiffs in this action were necessary parties defendant to the condemnation proceedings, it seems that they are not in a position to complain, for the reason that they voluntarily appeared in that proceeding through their attorney, and the journal entry of judgment recites their appearance, naming each of them. Further, it was stipulated in the trial of this case that the attorney who appeared for them in the condemnation proceeding was clothed with the authority to do so.

"The Court: It is stipulated by and between the parties plaintiff and defendant that for the purposes of this trial and no other purpose, plaintiffs do not and will not question the authority of J. I. Phelps to represent these plaintiffs and the other heirs of Hugh A. H. Leeper, deceased, as their attorney in the condemnation proceeding prosecuted in this court as case No. 5162."

It further appears that each of the plaintiffs herein received his proper proportionate share of the proceeds of the condemnation proceedings in due course of the ad-

ministration of the estate of Hugh A. H. Leeper, deceased.

As set out above, the trial court concluded, in view of the foregoing facts, that the plaintiffs were "estopped from asserting that they were not made parties to the condemnation proceedings." The plaintiffs did not save any exception to this conclusion. We concur in the conclusion of the trial court in this respect and hold that the plaintiffs are not in a position to complain that they were not formally named as parties defendant.

The plaintiffs contend, further, that, notwithstanding the fact that the district court of Canadian county may have had jurisdiction of the person of the necessary parties defendant, its power to determine the character of title that could be conferred through condemnation proceeding was limited by the statutes of the state of Oklahoma, and that any undertaking to confer upon or vest in the condemnor a greater title than authorized by statutory provision was in excess of the jurisdiction of that court over the subject-matter and in excess of its power to render the particular judgment rendered. The plaintiffs further argue in this connection that the applicable statutory provisions render it impossible for the condemnor to obtain an estate greater than an easement, which terminates upon abandonment. In answer to this contention the defendant asserts: First, that the nature of the title that could be obtained by the condemnor is determined by the charter provisions of Oklahoma City, a home-rule city. Second, that if such charter provisions do not govern, the statutes of this state, when properly interpreted, are broad enough to enable the court in condemnation proceedings to vest in the city a fee-simple title.

We must first determine whether the rights of Oklahoma City in this case in connection with the condemnation proceedings were governed by the statutes of the state of Oklahoma or by the charter provisions of Oklahoma City. The power of the home-rule city to adopt charter provisions which will prevail over the laws enacted by the Legislature depends upon whether such provisions relate to a matter of strict municipal concern. City of Sapulpa v. Land, 101 Okla. 22, 223 P. 640.

Counsel do not direct our attention to any previous decision of this court in which it has been determined that the power of a city to acquire property through an exercise of the right of eminent domain is governed by charter provisions rather than legislative enactment. On this question the authorities from other states are divided. Charter provisions are held to govern in the following cases: City of Kansas City v. Marsh Oil Co. (Mo.) 41 S. W. 943; City of McMinnville v. Howenstine (Ore.) 109 P. 81. To the same effect is the rule announced in the text in 10 R. C. L. at page 14. The Missouri case above mentioned, however, does not concern property situated outside the city limits and it is thus distinguished from the case at bar. The Oregon case above mentioned is cited in support of the text in R. C. L. However, we observe that this latter case was later repudiated by the same court (Oregon), especially in so far as it related to charter provisions extramural in effect. State v. Port of Astoria, 79 Ore. 1, 154 P. 399, and City of La Grande v. Municipal Court of City of La Grande (Ore.) 251 P. 308. The contrary view, which seems to us to be the sounder of the two, is expressed by the California court in the case of City of Los Angeles v. Koyer, 48 Cal. App. 720. 192 P. 301, wherein it is said:

"Whether this be so or not it is true that the exercise of the power of eminent domain for any purpose is not to be classed as a municipal affair."

We approve this view in so far as it relates to property outside of the city limits, and hold in accordance therewith that the power of a city to acquire property beyond its corporate limits is governed by the state statutes relating thereto. We reserve for determination in an appropriate action the question of whether the rule should obtain when the property is situated within the city limits.

The right of the defendant, Ramsey, to prevail herein depends upon the nature of the estate which the city acquired. If it acquired a fee-simple title, the deed was operative to vest that title in him. If the estate acquired through the condemnation proceedings was merely an easement dependent upon continued use for the purpose for which it was condemned, the easement terminated on abandonment and the plaintiffs should prevail. 10 R. C. L. 240. The language of the judgment in the condemnation proceedings is clear and explicit. It specifically decrees in the condemnor "fee-simple title." If the court was authorized to render such a judgment under the applicable statutory provisions, then the city acquired a fee-simple title through this judgment by virtue of the condemnation proceedings.

The plaintiffs contend that a municipality could not acquire a fee-simple title in land by exercising the power of eminent domain through condemnation proceedings. Their argument is based upon a construction by implication of certain statutory provisions of this state. The far-reaching effect of such a view, if adopted, can only be estimated when we consider the many millions of dollars worth of property that has heretofore been acquired by agencies of our state government through the exercise of the power of eminent domain. Not only would such a view affect the title to property owned by cities for the purpose of establishing systems of waterworks, but it would cast its shadow upon the title of property which has been acquired by municipal and quasi municipal corporations for other purposes, such as parks and the erection of schoolhouses, jails, city halls, courthouses, auditoriums, coliseums and other public buildings.

When land is condemned for the purpose of providing a water supply, such as in the construction of a reservoir, or for incidental use in connection therewith as in the instant case, jurors and appraisors do not make any deduction in the price paid the owner of the land on the theory that it might revert to him. Such condemnation is made in contemplation of a future continued use. In other words, cities and other municipal and quasi municipal corporations in the exercise of the right of eminent domain must, do, and should pay the full value of the land condemned. The court found that this had been done in the condemnation proceeding in the instant case. This being true, the power to grant a fee-simple title should rest in the courts when such a continued future use is contemplated. Likewise, it is apparent that the power to grant the absolute title should rest in the courts entertaining jurisdiction in the condemnation proceeding, where it is contemplated that in the future use of the property valuable and expensive improvements are to be placed on the land. Of course, so long as there is a continued use by the municipality of the land condemned, no hardship would be worked by the rule urged by plaintiffs, but human foresight is not always unerring and it is impossible to anticipate when an abandonment of such a use may be necessary or expedient. Changing conditions may require an absolute abandonment. Buildings previously erected may become inadequate. Water supplies previously established may become by future development and progress insufficient. In such cases it seems that the municipality should be in a position to sell that which it has previously acquired and improved and thereby minimize its loss. To illustrate: Suppose that the city of "A," being desirous of obtaining a water supply, votes a bond issue of $500,000. It condemns a lake or reservoir site on a stream of pure water, paying for the same from the proceeds of the bond issue. An oil field is discovered in the vicinity or even at a distance in the direction of the source of the stream. Pollution of the water supply by salt water and oil results. The water supply must be abandoned. Under the view urged by the plaintiffs, even though the city has exhausted its funds and even though it had paid the full value of the land involved, it must turn the same back to the original owners without compensation and must hazard its chance to reimburse itself entirely on the outcome of litigation arising out of the pollution and depending upon the continued solvency of those guilty of the wrongful destruction of the source of water supply. On the other hand, when the full value of the land is paid, the original owner and the court entertaining jurisdiction in the condemnation proceedings has the power to, and does vest a fee-simple title in the municipality and a market may be found for the lake or reservoir not inconsistent with its polluted condition, then the city should be permitted to sell the same. Such a market might exist among the oil companies causing the pollution and a sale of the improvements might be made and part or all of the proceeds of the previous bond issue be saved to the taxpayers. It seems that, if possible, the broad principle should be recognized and applied to cities as well as individuals that "if one pays the entire value for property the property should be his." These practical matters are, of course, of little benefit if the meaning of the governing statutes is clear and explicit and if the language therein used expressly or by proper implication limits the title which may be acquired. If such be the law, the question involved is one of policy with which the courts have little or no concern. On the other hand, if the statutory enactments involved are doubtful in their meaning and are susceptible of different constructions or interpretations, then the question involved becomes one of statutory construction and the courts are entitled in construing the acts and in determining their meaning, purpose, and effect to take into consideration the re-

sult that may follow from any particular interpretation that unjust and unreasonable construction may be avoided and unfair results may be prevented.

This brings us to a consideration of the statutes involved. According to the overwhelming weight of authority, the extent to which the power of eminent domain may be exercised by the state or one of its subdivisions and the nature of the estate that may be acquired through the exercise of that power, is a matter for the Legislature to determine in the first instance, and it is within the power of the Legislature to enact laws, in the absence of constitutional provisions to the contrary, which will enable fee-simple title to be acquired. McQuillin on Municipal Corporation (2d Ed.) vol. 4, page 444, par. 1644; 20 C. J. 1221; annotation in 22 L. R. A. (N. S.) 76, and authorities therein cited. Two questions then arise: First, Does the Constitution contain any provision which prohibits the Legislature from enacting laws in connection with the power of eminent domain which will enable municipalties to acquire a fee-simple title through condemnation proceedings? Second, if no such prohibition appears in the Constitution, did the statutes of this state which were in force at the time of the condemnation proceedings herein involved, enable the municipalities to acquire such a title?

A review of the provisions of our state Constitution discloses that the only constitutional provision which limits or restricts the character of estate which may be acquired in the exercise of the power under discussion appears in section 24 of art. 2, and refers only to right of ways acquired by common carriers:

"The fee of land taken by common carriers for right of way, without the consent of the owner shall remain in such owner subject only to the use for which it is taken."

Since the entire constitutional provision above referred to includes provisions applicable alike to the exercise of eminent domain by the state itself and its various subdivisions as well as common carriers, and since the proviso with reference to the retention by the owner of the fee in the land relates only to common carriers, a proper case arises for the application of the familiar rule of construction: "Expressio unius est exclusio alterius" (The mention of one thing implies the exclusion of another). Thus, since the constitutional prohibition with reference to the acquiring

of a fee title is restricted to common carriers, it must be presumed that it is contemplated by the Constitution that none except common carriers (for rights of way) are prohibited from acquiring fee-simple title by constitutional inhibition. We do not question that the Legislature may determine the title that may be acquired in other classes of cases and by an appropriate statute define the title which municipalities may acquire in property outside the corporate limits through the power of eminent domain. The question is, What has the Legislature done? The answer to this question requires a review, analysis, and construction of the applicable statutory provisions.

The plaintiffs say that controlling weight should be attached to a clause which is contained in section 6060, O. S. 1931 (4411, C. O. S. 1921). We quote the statute emphasizing the clause referred to:

"The city councils of such cities, or the boards of trustees of such towns, shall have the power and authority to dam any river or stream not navigable, and condemn and appropriate in the name of and for use of the city or town any such land located in or outside of the corporate limits thereof as may be necessary for the construction and operation of said waterworks and to condemn, appropriate, and divert the water from such river or stream, or so much thereof as may be deemed necessary for such purposes. Such appropriation of land or of water rights by any city or town shall be governed by the procedure prescribed for the condemnation of land for railway purposes. Upon the payment made or deposit of the award of the commissioners to the clerk of the district court, said city or town **shall be vested with the perpetual right to use the land so condemned and the right to divert such water condemned,** by such commissioners for the purpose mentioned herein, and such water and the right to divert the same as aforesaid, may at the option of such city, town or village, be described in capacity by a given number of gallons daily, or as a quantity sufficient for the purposes aforesaid; and the exercise of this power shall be a continuing right and not exhausted by one or more exercises thereof; Provided, that the diverting of said water shall not change the regular channel or water course of such stream so dammed."

The plaintiffs in effect apply to this statute the same rule of construction which we have previously mentioned in connection with section 24 of art. 2 of the state Constitution, with reference to railroad rights of way. They say, in effect, that the mention of one thing, namely, "the perpetual

right to use the land so condemned," implies the exclusion of another, the acquiring of a fee-simple title.

If section 6060 stood alone and represented all of the legislative expressions concerning the nature of the title that could be acquired by a municipality, we would agree with plaintiffs' view for legal reasons, notwithstanding the contrary views which we entertain concerning the policy of such legislation. However, it does not stand alone. There are later statutes. But before mentioning or considering these later sections which deal with this subject, we call attention to the history of the section previously quoted, to wit, section 6060, O. S. 1931.

This section first made its appearance in 1893 (St. 1893, sec. 7559), having been adopted by the Territorial Legislature. In addition to its present provisions, it then contained certain provisions relating to procedure in condemnation proceedings, which provisions were later stricken by the revisers in preparing the Revised Laws of 1910, apparently because such provisions were in conflict with section 24, art. 2, of the Constitution. The particular provision quoted herein, however, remained intact and was carried forward in its original form. It is important to note in connection with the history of the act that at the time of its original adoption the government was territorial in form and obtained its authority from the Organic Act, passed in 1890, section 6 of which provided, in part:

"But no law shall be passed interfering with the primary disposal of the soil."

Without passing upon whether this provision of the Organic Act prevented enactment of a law which would enable a municipality to acquire a fee-simple title by condemnation procedure, it seems quite likely that it may have been a controlling factor in influencing the Oklahoma Territorial Legislature to place the "perpetual use" clause in the statute above referred to. At any rate, when our present Constitution was adopted in 1907, and the provisions of the Organic Act of 1890 no longer applied, the State Legislature passed a statute later designated as section 4507, C. O. S. 1921, section 538, Revised Laws 1910 (also Laws 1907-08, sec. 12, art. 4, page 192). We quote in part:

"Every municipal corporation within this state shall have the right to engage in any business or enterprise which may be engaged in by a person, firm or corporation by virtue of a franchise from said corporation, and every city containing a population of more than 2,000 inhabitants shall have the right and power to **acquire, own and maintain,** within or without the corporate limits of such city, real estate for sites and rights of way for public utility and public park purposes, and for the location thereon of waterworks, electric light and gas plants, hospitals, quarantine stations, garbage reduction plants, pipe lines for the transmission and transportation of gas, water and sewerage, and for any plant for the manufacture of any material for public improvement purposes, public buildings, **and for all such purposes shall have the power to exercise the right of eminent domain either within or without the corporate limits of such city, and to establish, lay, and operate any such plant or pipe line upon any land or right of way taken thereunder. * * *"**

Particular attention is directed to the emphasized portion of the above statute and the occurrence therein of the word "own," which, standing alone and unqualified by reference to a lesser estate, means a complete ownership of land in fee simple. As is said in 22 R. C. L., page 75:

"Owner Defined: * * * When used alone it imports an absolute owner or one who has complete dominion of the property owned, as the owner in fee of real property. * * * So there may be a legal and an equitable estate; the trustee and the cestui qui trust are both owners. * * * He is the owner of property who, in case of its destruction, must sustain the loss of it."

Other definitions of the word "owner" are:

"He who has dominion of a thing, real or personal, corporeal or incorporeal, which he has a right to enjoy and do with as he pleases,—even to spoil or destroy it, as far as the law permits, unless he be prevented by some agreement or covenant which restrains his right."

"The word 'owner,' when used alone, imports an absolute owner."

"Ownership—The right by which a thing belongs to some one in particular, to the exclusion of all others." (Bouvier's Law Dictionary, page 2437, Rawle's Third Revision and citations.)

"The word 'owner' standing alone, signifies absolute owner, or owner in fee simple not a qualified or limited estate in the land. Phillips v. Hardenburg, 80 S. W. 891, 895, 181 Mo. 463." 3 Words and Phrases (2nd Ser.) p. 851.

Section 4507 is a subsequent act of the Legislature definitely stating that a municipality may acquire and own real estate for a number of purposes enumerated and may acquire these by the exercise of the power of eminent domain. The same statute provides that the

city may acquire real estate for "public buildings." Would it be reasonable to interpret this statute to mean that the city could acquire only limited ownership in the real estate where it might want to spend hundreds of thousand of dollars for public buildings? In other words, did the Legislature intend that a city might have to erect buildings on property which it did not really own? Such a construction would lead to an absurdity. In order to ascertain the intention of the Legislature in the enactment of the statutes, courts should look to each part of the statute, to other statutes upon the same or relative subjects, and to the natural or absurd consequences of any particular interpretation. Blevens v. Graham Co., 72 Okla. 308, 182 P. 247. If there is a doubt or ambiguity in a statute, it is the duty of the courts in interpreting the same to give it the most reasonable and just interpretation as the Legislature intended rather than an interpretation unreasonable, unjust, or one that would lead to an absurdity. Ledegar v. Bockoven, Co. Treas., 77 Okla. 58, 185 P. 1097; Walton v. Donnelly, 83 Okla. 233, 201 P. 369.

No precise words are essential to authorize a condemnation of lands in fee. McQuillin on Municipal Corporations, vol. 4, p. 445, par. 1645.

Section 4507 confers on the city "the right and power to acquire, own, and maintain * * * real estate," through the power of eminent domain. These are stronger and broader powers than given the city by virtue of section 4411, supra, passed in 1893 and relied on by the plaintiffs; the words in the latter section being, "shall be vested with the perpetual right to use the land so condemned."

As set out above, section 4507 is a later statute than section 4411, with which it conflicts in describing the title that may be acquired. It is elementary that in the case of conflict between the provisions of different statutes, passed by the different Legislatures, the last in point of time must prevail, the same being the last expression of legislative intent. 59 C. J. 1042.

Another point that must not be overlooked is the effect, if any, of the incorporation of both of these statutes in the Revised Laws of 1910. It has been many times held in this jurisdiction that the adoption of the Revised Laws of 1910 amounts to a re-enactment of the law therein included. Barnett v. Barnett, 158 Okla. 270, 13 P. (2d) 104; Quick v. City of Fairview, 144 Okla. 231, 291 P. 95; Herndon v. State, 16 Okla. Cr. 586, 185 P. 701.

The question then arises, Does this re-enactment of the statutes by the adoption of the Revised Laws of 1910 destroy the importance of the fact that one was passed subsequent to the other? Does it render the two statutes co-equal in point of time as an expression of the legislative will? The true rule applicable to this situation is concisely stated in 59 C. J., at page 1101, paragraph 649, wherein it is said:

"The different sections should be regarded, not as prior and subsequent acts, but as simultaneous expressions of the legislative will; but where every means of reconciling inconsistencies has been employed in vain, the section last adopted will prevail, regardless of their relative positions in the Code or revisions."

And again, in 25 R. C. L., page 1012:

"The place assigned to a statute in a compilation cannot control the plain meaning expressed in the statute itself. Where there are two conflicting sections of a general compilation or Code of statute laws, that section should prevail which is derived from a course that can be considered as the last expression of the law-making power in enacting separate statutes upon the same subject, regardless of the order in which they are placed in the compilation."

It likewise appears that the Legislature of this state which authorized and adopted the Code intended that the history of the various provisions therein incorporated should continue to be an important element in determining the proper construction to be given in case of conflict. It was provided by that Legislature that the Code should be annotated (S. L. 1910-11, c. 88, page 192), and specifically provided that "Historical annotations showing the source and history of each section" should be incorporated therein. Thus it appears that, notwithstanding the re-enactment of both of these sections in the Revised Laws of 1910, the history of their enactment by previous Legislatures continued to be a controlling factor in determining the meaning in case of conflict.

Another and later expression of legislative intent on the same subject-matter is found in section 4569, C. O. S. 1921, a statutory provision relating to the power of eminent domain passed by the Legislature on March 6, 1911, which reads:

"The council may purchase or **condemn and hold for the city** within or outside of the city limits, all necessary land for hospital purposes and waterworks and erect, establish, and regulate hospitals, work-houses and poor houses, and provide for the government and support of the same, and make

regulations to secure the general health of the city, and to prevent and remove nuisances, and to make provisions for furnishing the city with water, and water rates shall be fixed annually by the council at their first meeting in June: provided, the condemnation of such property outside the city limits shall be regulated in all respects as provided by law."

While no specific mention is made of the character of title, it is important to note that no expression is included which in any way purports or pretends to limit the nature of the estate which may be acquired through the exercise of the power of eminent domain. There is no conflict between section 4507, supra, and section 4569, supra, as to the interest the city may acquire by condemnation proceedings. The conflict exists between sections 4411 and 4507, supra. Therefore, it seems clear, on a review of the foregoing statutory authorities, that the last expression of the Legislature upon this subject contemplates that the various municipalities of the state should have the power, through condemnation proceedings, to acquire a fee-simple title.

Another matter worthy of consideration is that the same statute (section 4507, supra) which authorizes the city to condemn land likewise authorizes the purchase thereof. Cities acquire their powers by grant, either express or implied, and when they act either by purchasing or condemning property, they must find authority in the statutes or Constitution of the state. The same words of description with reference to the estate that may be acquired by condemnation apply to the estate that may be acquired by purchase. The municipality derives its right to purchase by delegation from the state through legislative acts. If the language therein used is to be construed to prevent cities from acquiring a fee-simple title by condemnation, it must likewise be held to have a similar effect on its right to purchase. Yet the right of the city to acquire fee-simple title by purchase was early recognized in the case of Owen et al. v. City of Tulsa, 27 Okla. 264, 111 P. 320. No one would question the existence of that right. Yet plaintiffs' theory, if adopted, would compel us to say that in one breath the word "owner" is broad enough in case of purchase to include a fee-simple title and in the next, referring to eminent domain, that it is not.

The case at bar comes clearly within the rule announced in the recent case of Skelly Oil Co. v. Kelly (Kan.) 5 P. (2d) 823, opinion December 12, 1931. The facts of that case are that the city council of Atchison, Kan., condemned certain lots for the establishment of a park. These lots were not used for a park and were sold to the defendant, who erected a filling station thereon. The plaintiff sought to recover the property upon the ground that the city had acquired only an easement through its condemnation proceedings. There were two statutes providing for condemnation of property by the city, one a general statute granting an easement for condemnation generally, the other a special statute empowering the city to acquire the title where property was condemned for park purposes. It was held that the special statute controlled, giving the city and its grantee a fee-simple title, and that the former owners could not recover the lands after sale by the city. In that case the court said:

"The court will not infer from the allegations relating to nonuser for park purposes, and sale to plaintiff for a good price for private use, that the land was condemned or held for speculative purposes, and the answer does not disclose facts showing that either condemnation or sale was made other than in good-faith exercise of corporate power, which the city commission supposed it possessed.

"Solution of the question presented depends on the extent of the interest which the city acquired by condemnation. This must be ascertained from the legislative grant of power to condemn, and the question is one of interpretation. * * *

"The statute would have been effective to vest right to possess, occupy, use, and improve without making special reference to parks, parkways, and boulevards, and without making special reference to vesting of title. The Legislature, however, deemed it important to insert a special provision relating to vesting of title in case of condemnation for parks, parkways, and boulevards. **This vesting of title is unqualified.** * * * The provision is that when land is condemned for parks, parkways, and boulevards, title shall vest on publication of the resolution. There is no connotation that title shall vest **while or so long as the land is used for park purposes,** and the court holds that in this instance the city acquired a fee-simple without so-called possibilty of reverter to former owners."

Likewise the Oklahoma Legislature did not intend to limit the cities of Oklahoma to acquiring, owning, and maintaining, and condemning and holding, the lands in question only so long as the same were used for waterworks. As was said in the Kansas case. there is no connotation or limitation that title shall vest only in such limited sense.

The word "own," as used in the statute, means an unqualified vesting of title. The fact that subsequent events rendered it unnecessary for the city to have to use all of the 82.79 acres of land so condemned for waterworks purposes, does not in any way limit the character of estate acquired in the land. The court before whom the condemnation proceedings were had, passed on whether or not the exigencies of the demands of the city made necessary the taking of the fee-simple title. The journal entry so recites, as quoted hereafter.

Considerable importance is attached in the brief of the plaintiffs herein to the case of Carter v. Davis, 141 Okla. 172, 284 P. 3. That case in no way conflicts with the views herein announced, and is clearly distinguished from the case at bar in that the condemnation proceedings therein involved did not undertake to confer a fee-simple title. This fact is revealed by the opinion, which reads in part:

"Cases may arise where a municipality, as condemnor, under the rule of necessity, and in the absence of statute to that effect, may take a full fee-simple title to the premises condemned where it clearly appears from the proceedings that such interest was in fact condemned; but this rule cannot be invoked in the instant case, as, under the facts, it cannot be said that it was necessary for the school district to acquire the full fee-simple title to accomplish the purpose for which the lots were taken; nor does it appear from the proceedings that such interest was, in fact, condemned."

In the case at bar the judgment rendered in the condemnation proceedings specifically conferred on the city of Oklahoma City the fee-simple title. The record discloses that the judgment recited "that in consideration of the payment of the full value of the lands condemned, the fee-simple title is hereby vested in the plaintiff herein as provided by law."

The judgment thus rendered vesting fee-simple title was within the issues tendered by the pleadings in the condemnation proceedings. The petition in that action contains the following statement:

"Containing in all 82.79 acres more or less, that the said land so hereinbefore last described and which is necessary to be entirely appropriated by this plaintiff contains eighty-two and 79/100 (82.79) acres of land measured and surveyed."

And in the prayer of the petition it is requested that:

"Upon final hearing in said cause judgment be rendered barring said defendants and each of them and all persons claiming by, through or under them any right, title, or interest in or to said premises so sought to be appropriated by the plaintiff."

We do not hold that the court entertaining jurisdiction of the condemnation proceedings could not have limited the estate vested in the condemnor to a lesser estate than a fee-simple. The controlling fact is that it did not. If the plaintiffs were dissatisfied with the judgment, they should have complained at the time.

It is urged by the plaintiffs in this case that the words "as provided by law," appearing in the judgment rendered in the condemnation proceedings after the words "fee-simple title," are words of limitation and operate to reduce the fee-simple title to a mere easement. This argument is based on the theory that the statutes restrict the title that may be acquired to an easement. Since the statutes are not susceptible of such a construction, it becomes immaterial whether the words "as provided by law" are words of limitation or explanation, or merely surplusage to which no binding importance can be attached.

The court in which the condemnation proceedings were filed had jurisdiction of the subject-matter. The judgment rendered was within the issues tendered by the pleadings and the court had jurisdiction and power to render the particular judgment rendered. The court either had jurisdiction of the persons of all necessary defendants, or the plaintiffs herein eliminated this question by appearing in the condemnation proceeding through their attorney and knowingly receiving the benefits of the action, having been paid the full value of the land appropriated. They are therefore estopped from asserting any lack of jurisdiction over their persons on the part of that court.

It is urged that the judgment rendered in the condemnation proceedings might likewise be upheld on the theory that a determination by the trial in that case that the statute in question confers the right to acquire a fee-simple title was a decision on an issue of law which, even though erroneous, would not be subject to collateral attack but could only be questioned by appropriate proceedings for review. However, we do not deem it necessary to discuss this question because of the view entertained in connection with the statutes involved and their interpretation.

The judgment of the trial court is reversed, with directions to enter judgment for

the defendant in accordance with the views herein expressed.

SWINDALL, McNEILL, OSBORN, and BAYLESS, JJ., concur. RILEY, C. J., CULLISON, V. C. J., and ANDREWS and WELCH, JJ., dissent.

McNEILL, J. (specially concurring). In this case the good faith of the city when acquiring the property in question for the construction, erection, and maintenance of the waterworks system, conduits, machinery, and equipment necessary to supply water to Oklahoma City appears to be admitted.

It is my opinion that when the city acquired by condemnation proceedings and appropriated the tract of land in question for the purpose of the waterworks system, it obtained the full and complete legal title in fee to the same without qualification or limitation, or restriction of any kind. If it was not a fee-simple title, it had all the attributes of a fee-simple title. The rights acquired included perpetuity and an exclusive use and possession of the premises. See New Mexico v. United States Trust Co., 172 U. S. 171.

The title ex necessitate must lodge and vest, and it appears to me that logically it vested in the city. The validity of the condemnation proceedings is not questioned. These proceedings were regular in so far as this record shows, and were within the strict compulsory provisions of the law, and the damages which were awarded were voluntarily accepted. No effort was attempted to be made by these proceedings to place any limitation in time on the land condemned, or to impose any restrictive easement upon the same. All legal damages, including the market value of the land, by reason of the taking, immediate and remote, arising from the appropriation, fixed and measured under the authorities of this court as of the date upon which the money awarded by the commissioners was paid to claimant or into court, were paid to the owners of the land which had been condemned. Thereafter, in my opinion, the landowners had no further interest in this appropriated land. Their rights in and to the land were extinguished by the original taking and the appropriation of the land. The landowners were thereafter excluded from all property rights and title in and to the same. Their rights after the taking were limited either to question the legality of the proceedings by which possession of the land had been taken from them or to recover compensation for the entire damages sustained by them in the loss

of their rights taken by the city to use the land for its purposes. That right was fully met and paid for by the judgment rendered to the landowners in their appeal from the award by the commissioners. After this condemnation money was accepted, they had no further standing to raise the question of title.

The taking of the land in question for a public use under specific authority granted to the city through eminent domain proceedings is inconsistent with any divided control or use of the land. See Barnes v. Peck (Mass.) 187 N. E. 176.

To put the limitations attempted to be placed upon the land by the plaintiffs would be exacting the value of a fee in the land, and any additional damages resulting therefrom by reason of the taking for a mere user of the land only. See Brooklyn Park Commissioners v. Armstrong, 45 N. Y. 234, 6 Am. Rep. 70. In that case the city of Brooklyn condemned a tract of land for a public park. After full compensation had been made to the owner, the city thereafter conveyed the land to another and the question arose as to whether the city could give good title to the same. In that case the court stated as follows:

"Language may be broad enough to vest an absolute title to lands, without being technical in its terms. If the expressions are such as that the whole force of them is not applied, unless a fee simple is created that estate will be taken, though the exact words be not used. * * * *

"When the fee is taken from the former owner, it must be held that he is fully compensated at the time of the original taking, and that the possibility that the land may at any future time revert to him by the cessation of the public use is too remote and contingent to be considered as property at all. Heyward v. Mayor, supra, * * *

"Doubtless, in most cases, when land is condemned for a special purpose, on the score of public utility, the sequestration is limited to that particular use. But this is where the property is not taken, but the use only. Then, the right of the public being limited to the use, when the use ceases the right ceases. Where the property is taken, the owner paid its true value, and the title vested in the public, it owns the whole property, and not merely the use; and, though the particular use may be abandoned, the right to the property remains. The property is still held in trust for the public by the authorities. By legislative sanction it may be sold, be changed in its character from realty to personalty, and the avails be de-

voted to general or special public purposes. DeVaraigne v. Fox, 2 Blachf. 95."

Lewis, Eminent Domain (2d Ed.) vol. 2. p. 1285, sec. 596, states:

"Where only an easement is taken for public use, and the use is abandoned, the land reverts to the original proprietor, his heirs or assigns, or perhaps more properly the land is relieved of the burden cast upon it, and the owner of the fee is restored to his complete dominion over it. And an easement taken for one purpose cannot be used for a different purpose. Thus an easement taken for a canal cannot be transferred to a railroad to be used for railroad purposes, even by authority of the Legislature.

"But, where a fee simple is taken, the weight of authority is that there is no reversion, but, when the particular use ceases, the property may, by authority of the state, be disposed of for either public or private uses."

In the case of Skelly Oil Co. v. Kelly et al. (Kan.) 5 P. (2d) 823, an action was brought to quiet title to land The land was condemned by the city for a park. Thereafter the city conveyed the land without using the same for park purposes. The purchaser commenced an action to quiet title against the former owners. A demurrer was sustained to the answer of the defendant claiming reverter. The court upheld the action of the district court in sustaining the demurrer. In that case, the Supreme Court of Kansas, though considering somewhat different statutes relating to condemnation proceedings, in addition to the quoted portion in the majorty opinion, said:

"The record of the steps pursued in perfecting condemnation constitutes the means of establishing the city's title, and it is the interest which the city acquired by the condemnation proceedings which vests. * * *

"The fee of the owners was not simply burdened with a public use in the nature of an easement, as in highway, right of way, and some other cases. In such cases, the owner is not deprived of all interest. He is merely deprived of interest to the extent necessary for the particular use. When the particular use is abandoned, or the burden is otherwise removed, the owner has the same dominion he had before the public use was superimposed. In this instance, the owners whose land was condemned were stripped of all interest, and the land became absolute property of the city.

"The foregoing disposes of this case. Defendants claim in their capacities as owners of interest in land; indeed, as having complete ownership. They have no interest, and it is of no concern to them that, after acquiring a fee, the city did not devote the land to park purposes, and later sold it.

"The judgment of the district court is affirmed."

As I read the various statutes relating to the method of acquiring the land for waterworks purposes, I am not inclined to weigh the single words and the force of them except in the light of the spirit of the statutes. The rule of strict construction should not be applied to the meaning of single words in the same manner as the rule of strict construction is applied to the compulsory eminent domain proceedings. There is reason for applying the strictissimus rule as applied to the procedure for condemnation, but this rigid rule, in my opinion, has no force or application when directed to the meaning of single words in determining the intent and object of a legislative enactment. Under such circumstances a liberal and elastic interpretation suffices.

In the case of State v. Lowry, 77 N. E. 728, 4 L. R. A. (N. S.) 528, the Supreme Court of Indiana said:

"While it is proper to consider the force of particular words in determining whether a statute stands in need of construction, yet it is to be remembered that that conclusion arrived at, the method changes, and the intent should be sought by a consideration of the entire enactment. As stated by Dwarris, 'The framers of laws do not weigh only the force of single words, as philologists and critics, but of whole clauses and designated objects:' Potter's Dwarris on Stats. 196. It is by accommodating our mental vision to this evident truth that we avoid a wooden interpretation of the words and become able to apprehend the spirit of the statute. 'It is not the words of the law,' says the ancient Plowden, 'but the internal sense of it, that makes the law; the letter of the law is the body; the sense and reason of the law is the soul.' Eyston v. Studd, 2 Plow. 459. One of the maxims of the law which there is frequently occasion to employ in the constructure of statutes is that of 'Noscitur a sociis.' It is known from its associates or associations. * * *

"Another writer says: 'Not only are words and provisions modified to harmonize with the leading and controlling purpose or intenton of an act, but also by comparison of one subordinate part with another: that is to say, the sense of particular words or phrases may be greatly influenced by the context, or their association with other words and clauses. The principle is embodied in the maxim, 'noscitur a sociis,' and is applicable to the construction of all written instruments."

Under the provisions of section 4569, O. O. S. 1921, the council may purchase or condemn and hold for the city, within or out-

side of the city limits, all necessary land for waterworks and make provision for furnishing the city with water. This section further provides that the condemnation of such property outside the city limits shall be regulated in all respects as provided by law.

In my opinion, there is no conflict between section 4411 and 4507, C. O. S. 1921. Section 4411 has specific reference to the condemnation of land and water rights by cities and towns, more strictly speaking, in considering the damming of any river or stream, not navigable, and the condemning or appropriating in the name of and for the use of such city or town any such land in or outside the corporate limits thereof as may be necessary for the construction and operation of said waterworks, etc.

Section 4507, supra, is broader in its provisions and specifically provides that every city with the required population shall have the right and power to acquire, own, and maintain within or without the corporate limits any such real estate for sites and right of way for public utility for the erection thereon of waterworks, etc., and shall have the power to exercise the right of eminent domain and to establish, lay and operate any such plant upon any land or right of way taken thereunder. Other provisions are incorporated in section 4507, not provided for under section 4411. Section 4507 does not authorize the towns the right and power to acquire, own, and maintain real estate sites for waterworks purposes, etc. Such power to towns is expressly limited by section 4411.

A fair interpretation of the reading of aforesaid sections of the statutes, in my opinion, is a clear right and authority on the part of a city to take any land necessary for such purposes through the right of eminent domain, and that such a taking does not in any sense mean an easement upon the land. When land is condemned under section 4507, supra, authorizing the city to establish, lay, and operate any such waterworks system "upon any land," taken under the right of eminent domain means that the land itself was taken, not an easement, and that a fee-simple title vested in the city.

In the instant case the necessity of the taking was not questioned. The land was appropriated for a lawful purpose and in strict compliance with the statutes, and it must be assumed that the landowners were fully compensated for all their rights, title, and interest in and to the same. There is nothing in these sections of the statutes which prohibits the city from bartering, selling, and disposing of said land after the necessity of its use no longer exists, or when the same for any reason cannot be maintained by reason of pollution of its sources, inadequacy of sources of supply, or for any other reason. To hold that an easement was created, under the record in this case, after the municipality had acquired the land itself, and not an easement, by eminent domain proceedings, and imposed heavy burdens upon the taxpayers of the municipality which the governing body deemed a necessity in meeting the required demands of Oklahoma City, and then to permit the land to revert to the original owners who had been paid full compensation for the taking of the land itself, and not an easement, would be unjust, inequitable, and contrary to the clear import and meaning of the statutes.

It is my view that no rights of the landowners were reserved by the condemnation proceedings and no rights of theirs were sheltered in the land after the same was taken and appropriated and the condemnation money fully paid. The statutes, though not expressly designating a fee-simple title in the city by eminent domain proceedings, to all intents and purposes vested a title in the city, with all the attributes and substantiality of a fee-simple title; a right of perpetuity and the exclusive use and possession of the land were acquired by eminent domain proceedings.

In my opinion, the title to the land in the instant case was completely divested. Oklahoma City did not, through the eminent domain proceedings, place any limitation or restriction on the original taking of the land in question, and no servitude was ever created upon the land. Under this record there can be no reverter to the original landowners, their heirs, successors, or assigns.

RILEY, C. J. (dissenting). The rule of "Expressio unius est exclusio alterius" has no proper application to the restrictive proviso contained in section 24, art. 2, Const. of Oklahoma, which prevents the passing of a fee from the landowner in condemnation by common carrier for right of way purposes.

If the specifications of the constitutional restriction give rise to a self-enacting provision for the passing of the title to condemnor in all other cases of condemnation, there would be no occasion for examination of mere statutes, nor would it be proper to hold that "the Legislature may determine the title that may be acquired in other classes

or cases" and "define the title which municipalities may acquire * * * through the power of eminent domain." For it is elementary that the Constitution may not be amended by mere legislative act. Simpson v. Hill, 128 Okla. 269, 263 P. 635.

This maxim of construction, the same as "Expressum facit cessare tacitum," ordinarily is applied to the construction of wills and deeds. It deals with grants and affirmative declarations, and obviates in construction resort to implications. For example, where a lease contains an express covenant by a tenant to repair, there can be no implied contract to repair arising from the relation of landlord and tenant. As applied to law, its application is to an affirmative mode stated in the law. A prohibition stated in the Constitution would not be a grant of authority in all other or different cases for a contrary method, but "if authority is given expressly, though by affirmative words, upon a defined condition, the expression of that condition excludes the doing of the act authorized under other circumstances than those so defined." Lord Campbell admonishes great caution in dealing with the maxim. Saunders v. Evans, 8 H. L. Cas. 729.

Section 4411, C. O. S. 1921, is a statute that ought to be considered in pari materia for the determination of the extent of the taking in the instant case. That statute confers on cities and towns the powers of eminent domain for the waterworks purpose. It grants the privilege to "condemn and appropriate * * * for the use of the city or town any such land." The procedure prescribed is the same as that designated for railway purposes. The extent of the taking is limited to "the perpetual right to use the land so condemned."

A bare majority of the court has rejected the solemn provisions of this statute as a result of an involved effort attempting to show antiquity of the enactment in comparison with another statute (section 4507, C. O. S. 1921), existing for manifold purposes, and finally adopted at the same time as a part of the revision of the laws of 1910.

"Whether or not the laws contained in the Harris-Day Code were ever previously enacted by the Legislature of this state, or were written in said Code by the codifiers without having previously been enacted into law by the Legislature of this state, the adoption of said Code by the Legislature gave life and force to every section of said Code." Readdy v. Mallory, 57 Okla. 499, 157 P. 742; Quick v. City of Fairview, 144 Okla. 231, 291 P. 95.

New and simultaneous life was breathed into this statute by the adoption of the Code, and reference may be had to antecedent legislation only to solve a doubt, not to create one. 59 C. J. 1099; Merchants Natl. Bk., etc., v. U. S., 42 Ct. Cl. 6, 29 S. Ct. 593, 214 U. S. 33, 53 L. Ed. 899.

"All the different parts of the revision or Code, particularly those parts which relate to the same subject, must be construed together with a view to harmonize them, if possible, and giving effect to each." 59 C. J. 1100.

Since the right of the codifiers to amend, subject to legislative adoption, was granted by the Legislature and by the courts sustained, is it not logical to conclude that a simultaneous adoption in the Code of two or more sections on the same subject was with the view that the one would supplement and explain the other? How, then, can the majority reasonably resolve a conflict in the meaning of section 4411, supra, and section 4507, as to the extent of the title to be taken under the powers of eminent domain, and as a result of the conflict so resolved, but which does not actually exist, totally annihilate the provisions of the former statute?

In fact, there is no conflict; the latter statute (4507) is a broad one enacted for the purpose of enabling cities to engage in any business which may be engaged in by any person under a franchise from such a city, and cities of a population of more than 2,000 inhabitants, by the act, were empowered to **acquire, own,** and **maintain** real estate for sites for such public utilities to be engaged in by it. By the segregation and use of the word "own," contained in this special statute, the majority holds that an absolute ownership amounting to a fee-simple title may be acquired in land as a result of condemnation proceedings where a city acquires the use of land for waterworks purposes.

The premise of the majority is in error. The definition relied upon and stated in 22 R. C. L. 75, is contrary to excerpts taken therefrom and used to support the false premise.

The excerpts so derived from the selected definition refute the majority conclusion. The written definition of the word "own" embraces a tenant for years, for life, and a remainder in fee. It comprehends the legal and the equitable estate and the general and the special owner. The whole words of the definition show variety of meaning ranging from the absolute to the mere possession with dominion.

It is said by the majority, as to the word "own," that "when used alone it imports an absolute owner **or** one who has complete dominion of the property." This is an alternative—the latter phrase exactly fits the former statute where the condemnor receives "the perpetual right to use" the property. It is significant that the word "own" is not used alone, but with two other words: "acquire" and "maintain." It is important that the word is used in connection with other statutes on the same subject, one erroneously said to be a former statute, wherein the title taken by the condemnor is analogous, by the use of the phrase "the perpetual right to use," to an easement, and a subsequent statute which denotes the last intention and expression of the Legislature, whereby the city was merely empowered to "condemn and hold" land for the waterworks purpose (amongst others).

Words & Phrases, vol. 5 (3rd Ser.), quoting from Makemson v. Dillon, 24 N. M. 302, 171 P. 673, states that the word "owned" applies to any lands in which there is any "right or interest." Such a definition clearly includes an easement. Contained in the same volume of Words and Phrases, quoted from by the majority and stated as the primary definition of the word "owner," is the following:

"An 'owner' is not necessarily one owning the fee simple or one having in the property the highest estate it will admit of. One having a lesser estate may be an owner, and, indeed, there may be different estates in the same property vested in different persons, and each be an owner thereof."

The following statements relating to the word are cited in the authority selected. They precede the definition inaptly chosen by the majority.

"The word 'owner' * * * is descriptive of various rights to an interest in land."

"The word 'own' * * * varies in its significance according to context and subject-matter."

"The word 'owner,' as applied to real estate, may designate the owner of the fee or the owner of a less estate, as a lessee for a term of years."

"An 'owner' of a thing is he who has dominion over it, including the idea of right of possession. The word 'owner,' as applied to land, has no fixed meaning. * * *"

"The word 'owned' means held or occupied. * * *"

"The word 'owner' is a generic term which embraces the different species of interest which may be carved out of a fee-simple estate."

In short, the majority rejected 62 previous definitions of the word "own" contained in the authority selected by it before finding one to suit its purpose. Moreover, the definition selected by the majority was one dealing with the use of the word as contained in an allegation of a petition, in which case, of course, the word is given the maximum of meaning. Phillips v. Hardenburg, 181 Mo. 476.

It is said by the majority that the grant of power contained in the last expression of the Legislature, section 4569, C. O. S. 1921, to "condemn and hold for the city within or outside of the city limits, all necessary land for * * * waterworks, * * *" makes no mention of the "character of title" and "no expression is included which in any way purports or pretends to limit the nature of the estate which may be acquired through the exercise of the powers of eminent domain"; that "there is no conflict between section 4507, supra, and section 4569, supra, as to the interest the city may acquire by condemnation proceedings," but that "conflict exists between sections 4411 and 4507, supra, and, therefore, it seems clear * * * that the last expression of the Legislature * * * contemplates that the various municipalities of the state should have the power through condemnation proceedings to acquire a fee-simple title." These statements are ridiculous and unworthy of the thought of my esteemed associates.

Now, since the last enactment (section 4569) is not in conflict with section 4507, and since section 4569 does not designate the character of the estate taken by the condemnor, then neither does the former section 4507, relied upon by the majority, designate the extent of the taking. Moreover, section 4507 simply specifies that the city shall "own" the land taken, whereas section 4569 grants permission to the city to "hold" the lands condemned. There is no limitation of the nature of the estate which may be acquired by the power in either statute. There is not a suggestion as to limitation of the extent of the taking in either statute, nor is it necessarily a question of limitations. The question is one as to authorization or grant by the Legislature for the taking of a fee-simple title. Unless the city has been authorized to take a fee, or unless the court has been empowered to determine, under alleged necessity, the extent of the taking (and there is no such authorization by our statute).

then only an estate in the nature of an easement may be taken by the condemnor, and a judgment as in the original proceedings presented in the case at bar is beyond that which the court was empowered to render; it is void.

The last enactment of the Legislature simply empowers the city to "hold" land so condemned for the waterworks purpose. This authorization does not contemplate an alienation of the fee in the lands, nor a speculation by a divesting of title from the landowner and a vesting of it in a subsequent purchaser. It simply grants a power to "use" for the public benefit; "to hold" means to retain, to keep; when used in relation to land, it embraces the idea of actual possession. When used in the habendum clause of a deed, it includes the twofold idea of actual possession of the thing, and being invested with the legal title. Stansbury v. Hubner, 73 Md. 228, 20 Atl. 904; 4 Words & Phrases (1st Ser.) 3317.

Indeed, there is more reason, in view of the historical significance of the word and use in deeds, to say that it denotes an absolute estate than it is to denote such meaning to the word "own." Both such meanings in connection with the case at bar are equally absurd.

In this jurisdiction all statutory provisions as to the power of eminent domain, except as to public lands, lead back to the method devised for condemnation of right of way for railroad purposes.

Section 5505, C. O. S. 1921, being a part of article 14, ch. 34, relating to the power of eminent domain, provides:

"The provisions of this article with reference to eminent domain shall apply to **all** corporations having the right of eminent domain. * * *" (Municipal corporations are specifically mentioned.)

Some of the provisions of that article establish procedure, whereas others designate the character of the estate to be taken by **condemnor.**

Section 5504, Id., is of the latter class. It designates the extent of the taking. It provides:

"The fee of land over which a mere easement is taken without consent of the owner shall remain in such owner subject only to the use for which it was taken."

The result is that a fee title did not and could not pass from the Leepers, the landowners, unto Oklahoma City, the condemnor.

Section 4507, supra, relied upon by the majority specifies no method of its own for exercise of the power and consequently the all-embracing provisions of the general law apply to the corporation known as Oklahoma City, whereby, when the lands were taken without consent of the owner, the fee remained in the owner "subject only to the use for which" the land "was taken."

The decision in Skelly Oil Co. v. Kelly (Kan.) 5 P. (2d) 823, is relied upon to support the opposite view. There is little, if anything, in that decision to support the majority. That decision is of recent origin (1931). It is not a construction placed upon a statute adopted by this state. It is a random decision without citation of previous Kansas or other authority. That decision is contrary to the majority view. Its reasoning is in accord with the view herein expressed. That decision considers two different Kansas statutes: a general and a special statute. There was no provision of the general statute under consideration providing for the vesting of title upon condemnation, and to that extent the general statute of Kansas is exactly like the statute of Oklahoma applied by the majority to the case at bar. The rule as to such a statute is as stated by the Kansas court in the cited case:

"In such cases, the owner is not deprived of all interest. He is merely deprived of interest to the extent necessary for the particular use, when the particular use is abandoned, or the burden is otherwise removed, the owner has the same dominion he had before the public use was superimposed."

But in the Kansas case a special statute was found to be applicable. We have no such special statute, but, as will be hereinafter disclosed, the statutes applicable, and all statutes of this state, specify the contrary rule.

The special Kansas statute provided:

"The title to land condemned by any city for park, parkway or boulevards shall vest in such city upon the publication of the resolution of the governing body condemning the same."

Special procedural statutes are required for a vesting of the fee in condemnor, and resort must be had to them to ascertain just what the condemnor is to own or the extent of the taking, and whether title passes or mere possession. It is plain that by law it is provided in Oklahoma that title does not pass, but upon payment or deposit of condemnation money, mere possession passes to condemnor with right in the condemnor to impress the privately owned property with

the public use. "The determination of the character of the use" is then a judicial question. Article 2, sec. 24, Constitution.

Section 4569, C. O. S. 1921 (6403, O. S. 1931), history S. L. 1910-11, ch. 51, sec. 1, provides:

"The condemnation * * * shall be regulated in all respects as provided by law."

Section 4411, C. O. S. 1921, provides:

"Such appropriation of land * * * by any city or town shall be governed by the procedure prescribed for the condemnation of land for railway purposes."

Section 4507, supra, provides no procedure of its own, and undoubtedly section 5504, supra, governs as to nonpassing of fee-simple title from the landowner to the condemnor.

This view is in line with the Kansas rule that the extent of the interest which condemnor may take is solely within the province of the Legislature to determine.

Challiss v. Atchison Ry. Co., 16 Kan. 117, and the rule stated in Waterbury v. Platt, 75 Conn. 387, 96 Am. St. Rep. 229, 60 L. R. A. 211: The provisions of statute with respect to the extent of interest or right which may be taken are to be strictly construed.

See, also, Shawnee Co. v. Beckwith, 10 Kan. 453.

The rules of strict construction as to the extent of the taking seem to be uniform, and reasons supporting the rule seem to have been more enduring than the suggestion stated in the majority opinion.

When the interest to be taken is not expressly stated, the condemnor is presumed to take no greater interest than an easement where an easement is sufficient to satisfy the purposes of the taking. Harris v. Elliott, 10 Pet. 25, 9 L. Ed. 333; Kan. Cent. Ry. Co. v. Allen, 22 Kan. 203, 31 Am. Rep. 190.

The fact remains that it is not a governmental purpose, unless plainly made so, to take property from one citizen, to vest it in another, and for the government to speculate with individual property rights is abhorrent to the idea of civil liberty, notwithstanding that "the right which every individual has over his own property is always subordinate to the right which the community has over all."

Nichols on Eminent Domain, vol. 1, p. 462, states the rule that:

"The power to condemn the fee will not be included in the grant unless it is so expressly provided."

And:

"It is universally recognized that a grant of the power of eminent domain will not be extended by implication."

See paragraph 258, wherein the author (idem) states:

"The power of eminent domain will never pass by implication, and even when the power has been expressly granted, the grant will be construed strictly against the grantee."

10 R. C. L. p. 89, states the rule:

"It is universally recognized that a grant of the power of eminent domain will not be extended by implication, and that when an easement will justify the purposes of the grant, the power to condemn the fee will not be included in the grant unless it is so expressly provided."

The note to 3 L. R. A. 175, reads:

"The taking of private property for public use is in derogation of private rights—is hostile to the ordinary control of the citizen over his estate; and therefore statutes authorizing it are not to be extended in their operation by mere implication."

Thompson on Corporations, vol. 3, p. 683, par. 2758, says:

"Under the power of eminent domain the title acquired in and to the land appropriated is such as the statute confers."

In the Maryland case, Binney's Case, 2 Bland, 99, it was held that statutes conferring this privilege deserved no favor, and to construe them liberally would be sinning against the rights of property.

"Whether a fee-simple title or an easement only is acquired depends on the phraseology of the statute, and not the judgment of a court, for unless that court was empowered to render the particular judgment the same is void. Now as applied to eminent domain it is the expressed view that the character of the use and the question of the sufficiency of the consideration constitute the only judicial questions."

McQuillin on Municipal Corporations, vol. 4, p. 3167, says:

"Where a statute authorizes only an easement to be acquired by condemnation, the condemnation judgment cannot vest the municipality with the fee of the land, or the exclusive use thereof, since the statute enters into and forms a part of the judgment, and limits and qualifies the nature of the condemnation therein ordered.

"On the other hand, inasmuch as eminent domain is to be strictly construed, where the

statute is silent on the subject or is not clear as to whether it was intended to authorize or require a taking of a fee or only an easement, the well settled rule of construction is that the statute will be construed to authorize the taking of the interest only which is required by the necessity of the contemplated use.

"No implication ought to be indulged that a greater interest or estate is taken than is absolutely necessary to satisfy the language and object of the statute making the appropriation. * * * The land is taken for an avenue, and this purpose is fully satisfied by the taking of an easement in the land for the street or highway. There is nothing inconsistent in the public use of the land for an avenue, and the retention by the landowners of the fee, subject to the easement. It is not necessary that exact or technical language should be used in a statute for taking private property for public use in order to vest the fee in the public; but it must clearly appear, before this effect can be given to a statute, that it was the intention of the Legislature, disclosed by the act itself, to take a fee." Washington Cemetery v. Prospect Park R. Co., 68 N. Y. 591, followed in Re Comm. of Public Works, 10 N. Y. S. 705, 75 Hun. (N. Y.) 419.

The phrase "eminent domain" originated in the writings of an eminent publicist, Grotius, in 1625, who says:

"The property of subjects is under the eminent domain of the state, so that the state, or he who acts for it, may use and even alienate and destroy such property, not only in case of extreme necessity, in which even private persons have a right over the property of others."

"But for ends of pubic utility, to which ends these who founded civil society must be supposed to have intended that private ends should give away." Grotius De Jure Belli et Pacis, Lib. 3 c. 20; Wissler v. Yadkin River Power Co., 158 N. C. 465, 74 S. E. 460; George v. Consol. Lighting Co., 87 Vt. 411; 52 L. R. A. (N. S.) 850, Ann. Cas. 1916C, 416.

The extent of the interest taken under the power of eminent domain is subject to strict construction. It should be so.

"A" owns a fee-simple title—Blackacre. It came to him by descent from his ancestor. Upon it is located the home of "A", and there are buried his ancestors, his family and their descendants. From it "A" derives the fruits of his industry, and about it he enjoys his gains. "A" wills not to part with Blackacre. "M," a municipal subdivision, finds necessity for a specific public use of Blackacre and under the power of eminent domain, Blackacre is acquired for public use. That use ceases. Should "C" be permitted to take by purchase from "M", and for his private use, the estate so cherished by "A" and his descendants without specific authority therefor? I think not. Moreover, authority to profit, rather than use, as applied to this sovereign power, should be sparingly granted.

CULLISON, V. C. J., and ANDREWS and WELCH, JJ., concur in this dissent.