John W. SUBLETT, Plaintiff,

v.

The CITY OF TULSA, Oklahoma, a municipal corporation, et al., Defendants.

No. 41338.

Supreme Court of Oklahoma.

May 11, 1965.

As Corrected May 19, 1965.

As Amended on Denial of Rehearing June 8, 1965.

John W. Sublett, pro se, Tulsa.

Charles E. Norman, City Atty., Paul H. Johnson, Asst. City Atty., John Robert Seelye, Asst. City Atty., Tulsa, for defendants.

BERRY, Justice.

Plaintiff, individually and in behalf of all tax-paying voters of the City of Tulsa similarly situated, brings this proceeding asking this Court to assume original jurisdiction by granting Writ of Injunction. Relief is sought against the named defendants, enjoining each from acting in his individual and official capacity in respect to the matters herein summarized. Only questions of law relating to welfare and right of taxpayers of the City are involved, the pertinent facts involved having been stipulated. Jurisdiction is sought to be invoked under the authority of this Court to exercise superintending control over matters which are publici juris, and wherein time is of the essence as revealed by the pleadings and stipulations filed. Const., Art. VII, Sec. 2; Meder v. City of Oklahoma City, Okl., 350 P.2d 916; McVickers v. Zerger, Okl., 389 P.2d 977.

The defendant City is a municipal corporation operating under a charter form of government, the individually named defendants being duly elected officials who constitute the governing body. Pursuant to authority granted under Const., Art. X, Sec. 35, such officials adopted and approved Ordinance No. 10051, on December 29, 1964. The terms of the ordinance provided calling an election to submit the question of issuance of $2.5 million of limited tax general obligation bonds under Sec. 35, supra. Plaintiff brought this action to enjoin further proceedings in this proposed bond program.

As early as 1832 the Congress authorized a project for improvement of the Arkansas River (Rivers and Harbors Act, July 3, 1832). Consistently since that time the Congress has continued to extend authorization for improvement of the river channel. Most of this work has been confined to the portion of the river downstream from the confluence of Grand River, the principal improvements having been accomplished downstream from Ft. Smith, Arkansas. Subsequent to congressional authorization (Rivers and Harbors Act, 1935, Public Law 409, 74th Cong. H. R. 6732, 49 Stat. 1028), extensive surveys were conducted to ascertain feasibility of plans to improve the river and certain tributaries in Arkansas and Oklahoma.

Based upon these studies the Congress in 1945 acted upon the plans and recommendations, authorizing plans to improve the Arkansas by an extensive, coordinated construction and development of facilities for flood control, production of hydroelectric power, and to make the river navigable in Arkansas and Oklahoma. By appropriate legislation the Congress provided for a series (19) of locks and dams over 450 miles of the river, together with the requisite complement of installations upon various tributaries.

Included within the overall plan of development is a navigation channel nine feet deep from the mouth of Bird Creek, above Catoosa, Oklahoma, down the Verdigris River to the confluence with the Arkansas, and thence to the Mississippi River. Present plans encompass opening of the coordinated river system to navigation by barge traffic to the Town of Catoosa, adjacent to the City of Tulsa, by 1970, as all major installations presently are under construction, and those upon essential tributaries have been authorized. Unquestionably, completion of the river development plan and opening of the inland area to industrial navigation will provide tremendous impetus for extensive growth and development of the entire Arkansas River Valley. Being the northernmost terminus of the system and the largest city on the Arkansas, the City of Tulsa necessarily will be an integral part of the development, and enjoy the benefits to be derived. A specially prepared analysis of the economic impact upon the area affected by development of the Arkansas-Verdigris Rivers Navigation System is one factual basis of the present application. The nature, types and amounts of commercial traffic to be handled through the Port of Catoosa is disclosed. Benefits which will accrue to the area contiguous to the port, as well as to the seven-state area within the sphere of the port's influence are readily definable. No doubt exists as to the ultimate economic benefits to be settled upon the affected inland portion of this country.

The original recommendation of the Arkansas River Survey Board was for construction of the project at federal expense, provided local interests should bear the expense of adequate terminal and transfer facilities for navigation. In House Document No. 758, 79th Congress, Second Session, p. 71, the analysis of economic justification states:

"122. Should navigation improvements be authorized for construction, local interests should be required to provide adequate terminal and transfer facilities, and to bear the increased cost of maintenance and operation of all altered rail and highway routes, in-

cluding bridges and appurtenances, and utilities and other existing improvements, other than federally owned. Local interests have furnished written assurances that they would construct adequate public terminals, and it is believed that they would meet the other requirements of local cooperation."

And, further, in the feasibility and cost discussions of the proposed multi-purpose plan (Navigation, hydroelectric, flood control and irrigation), the survey states:

"* * * If a plan for multiple purposes is authorized for construction, local interests should be required to provide the same items of local cooperation as heretofore set forth for the navigation plan. These are: Provide adequate terminal and transfer facilities for navigation; and bear the increased cost of maintenance and operation of all altered rail and highway routes, including bridges and appurtenances, and utilities and other existing improvements, other than federally owned. * * *"

Upon this basis the Arkansas River Survey Board recommended construction and maintenance of the multi-purpose plan for development of the Arkansas River, provided local interests should assume the obligation of local cooperation as specified.

The City of Tulsa, as the largest city in proximity to the navigation terminus, acting by its Board of Commissioners, enacted a resolution on April 30, 1945, expressing an intent to provide the requisite local facilities required by completion of the navigation system. Further evidencing such intent, on October 22, 1963, the Board of Commissioners by resolution reaffirmed expression of an intent to provide local facilities necessary for handling river traffic through a port facility.

On October 4, 1963, the City of Tulsa and Rogers County, Oklahoma, a subdivision of the State, pursuant to statutory authority, 82 O.S.1961, § 1101 et seq., as amended, (82 O.S.Supp., § 1101 et seq.)

entered into a written agreement creating a joint City of Tulsa-Rogers County Port Authority covering all of the City and the County. Each entity combined to form a cooperative authority and authorize the execution of such agreement by the appropriate officers. Under such authorization the Port Authority has received general fund appropriations from both entities with which to finance operations generally.

By contract the Port secured a proposed engineering plan for port development, including the water terminal and industrial park areas, which was adopted by the Authority as authorized by statute. Requisite legal notice was given to all landowners affected by the development plan and hearings were scheduled.

The Authority proposes to include 1753 acres within the Port area for terminal facilities and creation of an industrial park. Acquisition costs presently are estimated at one million dollars, and development of approximately 300 acres in the industrial park entails expenditure of an additional one and one-half million dollars. The Port seeks to initiate development of the industrial park prior to completion of the navigation channel in an effort to attract industry to the area. This acceleration of the Port development would permit the Port to expedite the commercial and industrial potential more readily and make available at an earlier date the economic benefits which will accrue to the public. Aside from anticipated savings in land acquisition costs, if accomplished before completion of navigational facilities, (it appears that) development of the entire facility as a single operating unit would provide a unified, integrated system which could not be developed by individuals except at excessive costs.

Congressional budgetary authorizations, now appropriated or reasonably anticipated, indicate completion of the navigation system by 1970. However, the failure of local interests to assume the obligations of local cooperation noted above would leave the northern navigation terminus without a

port. Without a port the Arkansas-Verdigris navigation system would be changed and the navigation channel would not be completed into the area.

■ The constitutional requirement of Art. X, Sec. 35, that county funds derived from limited tax general obligation bonds can be utilized only within the county precludes Tulsa County from assuming the burden alone. The total assessed valuation of Rogers County, Oklahoma, could not support the costs of development of the Port of Catoosa. The county, however, intends to cooperate in development by providing off-site roads and highways, and by continuing to make appropriations for general operations of the Port.

Completion of the navigation channel and development of the Port will attract extensive industry and water commerce. The Port of Catoosa will rank as one of the largest inland water ports in the nation. Acquisition of land and development of the first phase of the industrial park would be considered sufficient evidence of the local intention to assume the obligation of local cooperation. Complete development of the Port is projected over a seven-year term. However, since public water terminals do not produce sufficient revenue to defray both ·capital costs and operating expenses, the Port Authority intends to use all revenues derived from development and operation of the industrial park to defray operating costs of both the terminal and port operation. Unless operating expenses of the Port are contributed to by revenues derived from operation of the industrial park, all other expenses for operation of the Port will require annual contributions from both city and county to the operating budget.

For these reasons, the Port Authority requested the City to authorize the Mayor to call an election and submit to the citizens the question whether they would authorize issuance of $2,500,000.00 in limited tax general obligation bonds to be used to finance land acquisition and industrial park development. By appropri-

ate action on December 29, 1964, the Board of Commissioners adopted Ordinance No. 10051, authorizing the Mayor to call such an election. Under this proposal the City would acquire title to the necessary land by purchase and by exercise of the right of eminent domain. Preparation and development of the industrial park would be completed in accordance with the plan of the Authority. The City then would lease the land and facilities to the Authority on a long-term basis, providing for management, operation, maintenance, repair and control of the properties to be carried on by the Authority.

Plaintiff asserts a right to injunctive relief upon the grounds that City Ordinance No. 10051, and the election, bond issue and project to be accomplished thereunder is defective, void and violative of specific provisions of our Constitution and the charter of the City of Tulsa. These matters are presented most ably under 17 separate propositions. While the importance of the case requires full and careful consideration, in interest of brevity we deem it proper to combine certain arguments for discussion wherever possible.

Plaintiff first contends the contemplated land acquisition for the purposes mentioned is for a private rather than a public purpose, and violative of Art. X, Secs. 14, 15 and 17 of the Constitution. In brief, these sections provide: (14) taxes shall be levied and collected by general laws and only for public purposes; (15) the state's credit shall not be given, loaned or pledged to any corporation, municipality or political subdivision; (17) the Legislature shall not authorize any county, city or incorporated district to obtain or appropriate, or levy any tax for or loan the state's credit to any association or corporation.

Plaintiff concludes such constitutional provisions reflect an intention that the people of this State do not wish to aid or finance private corporations, and public funds must be used only in aiding

genuine public purposes. However, plaintiff asserts the present proposal would not be used by the general public, but only by limited types of commercial interests, which clearly could not be a public use and would result in the benefits being in aid of private industry. Decisional authority from Massachusetts, Maine, Washington, Rhode Island and Nebraska is presented in support of the argument that such proposals are violative of the public purpose limitations of the different state constitutions, and constitute an attempt to use public funds to aid industry.

The real basis of plaintiff's argument is that the people of the state, by adoption of Sec. 35 as an amendment to Art. X, neither contemplated nor intended to apthorize any such vast and extensive programs as herein proposed. Thus, plaintiff says the city's action is nothing other than a blanket attempt to pledge the credit and the taxing power in order to aid private enterprise, which brings the matter within purview of the inhibitions of the Constitution, Art. X, Secs. 14, 15 and 17 as noted.

The amendment, Sec. 35, was adopted by the people of this State in May, 1962. The declared purpose and intent of the amendment was to provide method and means of securing and developing industry within or near cities and counties which chose to act. Adoption of the constitutional amendment was followed by legislative action which expanded and enlarged existing statutes (82 O.S.Supp., 1959, Secs. 1101–1114, inc.) creating port authorities. 82 O.S.Supp., 1963, Secs. 1101–1137, inc. Within the amended statutes, Sec. 1106 specifically declares the powers extended for creating facilities for industrial use are to be considered for a public purpose.

In McVickers v. Zerger, Okl., 389 P.2d 977, the first attack was made upon the constitutionality of Const., Art. X, Sec. 35. The incorporated City of Anadarko, acting through its city officials, proposed to call an election for the purpose of seeking approval of a plan to issue bonds, proceeds of which were to be used for the purpose of securing and developing industry in or near the city. In upholding the constitutionality of Sec. 35, we declared the amendment was to be construed in the light of its purpose, and that a practical interpretation was to be placed thereon in order to carry out the manifest purpose of the people in adopting such amendment. And, we further stated the provision of Sec. 35(e) (2) allowing the municipality to mortgage properties acquired under the Act was not in conflict with Const., Art. X, Secs. 16 and 17.

We pass over discussion and analysis of decisions from other jurisdictions holding that industrial developments, such as herein proposed, were for private purposes and public funds derived from taxation could not be used therefor. It is unnecessary to trace the changing theories which have evolved from need for industrial development, attainable only through aid of public financing. Nor is it useful to consider the historical development and elaborate upon changing concepts which have led to enactment of permissive legislation for encouragement of industrial development by extending public financial assistance.

It is sufficient to note that many states such as Maine, Massachusetts, Mississippi, Missouri, Nebraska, Tennessee and Vermont, within the last three decades have enacted some form of legislation which permits publicly financed assistance for industrial development programs. Some states, including Oklahoma, now authorize issuance of general obligation bonds secured by full faith and credit of the State, or a political subdivision, in aid of industrial development. 62 O.S.1961, § 651 et seq.; 82 O.S.Supp., § 1121 et seq.

Some states, again including Oklahoma, authorize issuance of revenue bonds by the state, an agency thereof, or a political subdivision, in order to aid in attracting, acquiring and developing industry within the state. 62 O.S.1961, § 651 et seq.; 82 O.S. Supp., § 1121 et seq. Other states permit

establishment of public corporations to conduct industrial development programs. In Pennsylvania loans for such programs are authorized, funds therefor being appropriated from current revenues, secured by second mortgages upon the installation. Pa.Stat. Tit. 73, §§ 301–314. Similar programs are authorized by statute in Arkansas, Kansas and Kentucky.

Of particular interest is the fact that Maine, Rhode Island and Vermont, all of which formerly adhered to the rule that such programs did not relate to public use and that public funds could not be used to acquire lands to be used by private industries, have recognized the modern trend. These, and other states, now have legislation establishing state agencies which insure long-term, first mortgage loans by pledges of the state's credit, in order to provide means of financing programs of industrial development.

Review of numerous authorities cited by defendants discloses the modern theory that industrial development proposals are for public rather than private purposes, and therefore entitled to public financial aid, generally is based upon these recognized factors: (1) public importance of the project; (2) obvious public need; (3) vital economic stimuli in view of rational economic considerations; (4) and, as involves control and development of ports and similar installations, governmental interest therein by reason of the vital importance to economic development and national defense.

The basic question simply is whether acquisition and use of property under this proposed development is for a public purpose rather than for private use. If for a public purpose, then the expenditure of taxes collected under the general laws cannot be improper as being an expenditure of public funds for private use. Initially it must be recognized that our geographical limitations have prevented presentation of such questions. Because our decisional law provides little precedent, we necessarily consider persuasive the decisions of courts which have considered questions as to the character of the use and purpose of land involved in such an industrial development.

In 29A C.J.S. Eminent Domain § 49, the text states this rule:

"The development and improvement of harbors and ports is a public use or purpose for which private property may be condemned. The use is public notwithstanding the fact that the harbor or port is not available for indiscriminate use by the public, or that certain parts are leased for the separate use of persons or corporations having a regular or continuous need of harbor or port conveniences."

18 Am.Jur., Eminent Domain, Sec. 68, states the rule thus:

" * * It has been held more than once that land taken by a city for docks, piers, and wharves is taken for public use, although some portion of it is thereafter, in the discretion of the municipal authorities, set apart and put in the exclusive possession of a steamship line for the sole purpose of loading and discharging cargoes of freight and passengers. The public nature of docks, piers, and wharves, belonging to a municipality, is not taken away by leasing them separately to different parties exclusively for commerce, pursuant to a general plan that aims to accommodate all comers. * * *"

Fullest application of the quoted rule may be observed in Marchant v. Mayor, etc., of Baltimore, 146 Md. 513, 126 A. 884, and Atwood v. Willacy County Navigation District, (Tex.Civ.App.), 271 S.W.2d 137; Commissioner of Internal Revenue v. Ten Eyck (CCA 2d) 76 F.2d 515; Visina v. Freeman, 252 Minn. 177, 89 N.W.2d 635; Wayland v. Snapp et al., 232 Ark. 57, 334 S.W.2d 633. These decisions typically demonstrate the modern theory of approving publicly financed industrial development programs as constituting a public use or purpose for municipal development which

justifies special treatment because of obvious public need.

In the Marchant case, supra, that court quoted from 1 Dillon on Municipal Corporations (5th Ed.), Sec. 269:

" 'The construction of docks and wharves by a municipality for general public use is a public purpose which justifies the exercise of the power of eminent domain. To minister to the necessities of commerce, by providing fit and proper places in a seaport where ships can be loaded and unloaded with all proper facilities, is a public duty owing by the state, and through it by the municipality which governs and controls the port. * * * If a permanent pier and an exclusive right to its use be a necessity of large steamship lines, without which business cannot properly be transacted, and in the absence of which steamers will resort to other ports, then the duty rests upon the state or municipality to furnish such quarters for a fair compensation, or else the state is bound to permit the steamship companies to obtain such accommodations from private owners. Having undertaken the duty imposed upon it by the state to provide such accommodations as the interests of commerce fairly require, all appropriate acts of a city done in the performance of that duty are for a public purpose. Hence land taken for wharves is taken for a public purpose, although some portions of the land actually used may be thereafter, in the discretion of the city, divided off and placed in the exclusive possession of a lessee for the sole purpose of using it in the transaction of the necessary business connected with the loading and unloading of passengers and cargoes of ships and steamers.' "

And, referring to a city's right to condemn land for use in constructing piers under a statute permitting leasing such facilities, the court quoted from Matter of Mayor, etc., of New York, 135 N.Y. 253, 31 N.E. 1043, 31 Am.St.Rep. 825:

" 'When used by lessees under the facts already stated, the use is a public one. The use is public while the property is thus leased, because it fills an undisputed necessity existing in regard to these common carriers by water, who are themselves engaged in fulfilling their obligations to the general public,—obligations which could not otherwise be properly or effectually performed.' "

In Atwood v. Willacy County Navigation District, supra, the District was granted legislative authority to acquire and own lands adjacent or accessible to navigable waters necessary for all purposes incident to development and operation of navigable waters or ports, or required for developing industries. The statute declared acquisition and development of ports and facilities to be for a public purpose. Against the claim that such legislation was unconstitutional, that court said:

"[2-4] The term 'public use' is employed in the constitutional provision and consequently the question of whether or not an Act of the Legislature permits the taking of property for other than a public use necessarily presents a judicial question. City of Cincinnati v. Vester, 281 U.S. 439, 50 S.Ct. 360, 74 L.Ed. 950; Fallbrook Irrigation Dist. v. Bradley, 164 U.S. 112, 159, 17 S.Ct. 56, 41 L.Ed. 369, 388; 2 Nichols, Eminent Domain, Sec. 7.4; 18 Am. Jur. 675, Eminent Domain, § 46; 16 Tex.Jur. 577, Eminent Domain, § 15. The declaration of the Legislature upon the subject, however, is entitled to great weight and respect in arriving at a final decision of the question. Not only is the Legislature one of the coordinate branches of government under our constitution, but it is the final arbiter of matters legislative, subject only to the constitution, which is the superior legislative charter. The judicial process comes into action only to

vindicate this superior and paramount legislative enactment. We are also mindful of the fact that the Legislative branch through its use of committees and other fact finding methods may perhaps occupy a more favorable position than a judicial body in determining what is necessary to a successful operation of a municipal enterprise such as a port. The emergency declared by the Legislature in passing the 1947 amendment upon a suspension of the rules, was that 'this legislation is necessary immediately to permit the districts affected to provide for the industrial development of lands adjacent or accessible to the navigable waters and ports developed by them'. We therefore have a direct Legislative declaration, both in the body of the Act and in the emergency clause, that the taking of lands under the power of eminent domain for industrial development is a taking for 'a public purpose and a matter of public necessity.'

"* * * * * *

"[10] We hold that the acquisition of land for the purpose of leasing the same as industrial sites in the proximity of a port is reasonably necessary to the successful operation of such port. Such use comes well within the definition of 'public use' as laid down in the case of Housing Authority of City of Dallas v. Higginbotham, 135 Tex. 158, 143 S.W. 2d 79, 130 A.L.R. 1053, * * *."

■ In Commissioner of Internal Revenue v. Ten Eyck, (CCA 2d) 76 F.2d 515, in considering related phases of the matter, the Federal Court observed:

"The governmental character of public wharves, or piers as well as rights in navigable water and landing places, have been recognized by the courts. * * (citing numerous authorities). The interest of the people in navigation on the waters, and commerce over them, with their right to improvements by the erection of wharves, docks, piers, and terminal facilities, has been re-garded as creating a duty incumbent upon the state to develop them for the benefit of the people. Illinois Central R. R. Co. v. [State of] Illinois, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018."

■ Consonant with the accepted rule, we have held that whether the particular use to which publicly acquired property is to be put, is a public use within the meaning of the Constitution ultimately is a judicial question, unless there has been a legislative declaration that the given use is to be considered a public use. See City of Tulsa v. Williamson, Okl., 276 P.2d 209 and cases cited therein.

■ In Delfeld v. City of Tulsa et al., 191 Okl. 541, 131 P.2d 754, 143 A.L.R. 1032, the paramount issue was whether the condemnation accomplished by the city was for a public use, since it was contemplated a portion of the land condemned was to be deeded to the Federal Government. In declaring the land acquisition to be for public use we relied upon Bilby v. District Court, 159 Okl. 268, 15 P.2d 38, as authority for the principle that a public use need not be the use of the entire public, but may be a use for benefit of a restricted locality if such use is common. There we quoted from Nichols on Eminent Domain (2nd Ed.), Vol. 1, as supporting authority for our conclusion that a taking for "public use" sufficient to support the city's exercise of the right of eminent domain was any taking which inured to the benefit of the entire citizenry.

Moreover, the statutory authorization for establishment of port authorities (82 O.S. Supp.1963, § 1106(f)) explicitly declares that the exercise of authorization to acquire land for construction and operation of facilities for industrial use is "* * declared to be for a public purpose." The question thus is entirely comparable to that considered in the Atwood case, supra.

■ Recognized general rules, supported by authority from other jurisdictions which we consider persuasive, compel our conclusion. The contemplated acquisi-

tion of land, under the proposed industrial development program in proximity to the Port of Catoosa, is necessary to successful development of the port, and falls within the legal definition and requirements of a public use or purpose. From this it follows the taxes to be levied under the proposed ordinance, in the event adopted by the voters, will be expended for a public purpose within the meaning and intent of our Constitution. Such expenditure cannot be considered either a pledge of the state's credit, or an appropriation of money in aid of private enterprise and thus for a private purpose. The acquisition of land and the development for industrial purposes by the port authority with aid of funds derived from the proposed bond issue will not be violative of Const., Art. X, Secs. 14, 15 and 17.

 Propositions II and III may be combined for consideration and disposition. Under II, plaintiff claims the ordinance authorizing the bond election violated Sec. 16 of Art. X. It is urged that the purpose for which bonds are to be voted is not properly "specified" as therein required, because of failure to specify what industries will locate upon the planned facilities; and because expenditures are authorized both for a port and an industrial park without specifying the portion to be appropriated for either purpose. This contention is based upon the holding in Borin v. City of Erick, 190 Okl. 519, 125 P.2d 768. However, in Town of Nichols Hills v. Williamson, Okl., 323 P.2d 733, we reviewed several cases wherein similar attacks had been made upon proposed bond issues in other cities and towns. There we held that the stated purpose of the bonds must reflect for what purpose the money will be spent. But a *general statement* of the purpose complies with requirements of Sec. 16, supra, particularly because a taxpayer has a sufficient remedy if there is any attempt to use bond funds for anything other than the stated general purpose. See also City of Sallisaw v. Nesbitt, Okl., 380 P.2d 954; Palmer v. Town of Skiatook, 203 Okl. 316, 220 P.2d 273;

Public Service Co. of Okl. v. Town of Skiatook, 340 U.S. 869, 71 S.Ct. 126, 95 L.Ed. 634. We hold the ordinance in question sufficient to inform the taxpaying electors of the defendant city as to the purpose for which the bonds in question are to be voted, and thus does not violate Sec. 16, Art. X.

 Proposition III contends acquisition of land and construction of port facilities constitutes appropriation of funds, levying of taxes and loan of credit to private corporations or individuals, to be utilized in contravention of Art. X, Sec. 17. This contention is based upon the holding in Lawrence, etc. v. Schellstede et al., Okl., 348 P.2d 1078, wherein the provision was held to be a limitation adopted for the purpose of preventing investment of public funds in private enterprises. However, in Fischer v. Oklahoma City, 198 Okl. 22, 174 P.2d 244, we held that where land was acquired by eminent domain for airport use, the city properly could lease a part of the airport facilities to private corporations and individuals and such action did not violate Const., Art. X, Sec. 17. See Delfeld v. City of Tulsa · et al., supra, and authorities cited. Also see McVickers v. Zerger, Okl., 389 P.2d 977, in which we stated that Art. X, Sec. 35 did not conflict with Secs. 16 and 17 of Art. X.

Plaintiff contends (Proposition IV) that construction of the port and development of the industrial park will entail location of private industries, and lease or utilization by private corporations and individuals of these facilities, which will be exempt from ad valorem taxation, constituting surrender of the power of taxation in abrogation of Const., Art. X, Sec. 5.

 And, plaintiff says that despite the provision of Sec. 6 which declares all property of municipalities to be exempt from taxation, the property involved will be used by private interests, whereas the constitutional provision's reference to "all property" by. implication means property used exclusively for public purposes. But, we have determined heretofore that the proposed use of the property will be for a

public use or purpose. This question now argued was settled in State, etc. v. Mayes, Treasurer, 174 Okl. 286, 51 P.2d 266, wherein essentially the same argument was advanced, since the municipality contemplated the sale of water to individuals and corporations. We held specifically that all property of a municipality was exempt from taxation without regard to the character of the use to be made of the property. Also see City of Hartshorne v. Dickinson, 207 Okl. 305, 249 P.2d 422.

Propositions V and VI and VII involve the question of validity of the ordinance in view of the Const., Art. X, Sec. 35(d), which provides:

"Such bonds shall be serial, maturing annually after three (3) years from date of issue, and shall be paid as they mature, and no such bonds shall be issued for a period longer than thirty (30) years."

However, as pointed to by plaintiff, Sec. 1 of Ordinance 10051, respecting calling of an election for voter approval of the bond issue delineates the proposition:

" * * * said bonds to bear interest at not to exceed the rate of six per centum (6%) per annum, payable annually and to become due serially, beginning upon the third anniversary of the date of the bonds and within thirty (30) years from their date."

Because these propositions urge invalidity of the ordinance as being violative of Sec. 35 they may be combined for consideration.

Plaintiff's position is that the proposed ordinance authorizing the bonds is defective and invalid since it specifies a different maturity date, *the date of the bonds*, rather than the maturity date required by Sec. 35, supra.

To support the ordinance in the form enacted, defendants argue the date of the bonds and the date of issue are the same and govern the maturity date, rather than the actual date of delivery. Defendants say that exigencies of bond transactions require the maturing anniversaries of bonds to be the date of the bonds without regard to the date of delivery, and a standard system of payment of accrued interest has been developed to adjust monetary differences between issue date and delivery date of bonds. Authority for this argument appears in cases from other states such as Yesler et al. v. City of Seattle et al., 1 Wash. 308, 25 P. 1014, Whetstone v. City of Stuttgart, 193 Ark. 88, 97 S.W.2d 641, and City of Houston v. McGraw, 131 Tex. 127, 113 S.W.2d 1215. The first syllabus in Whetstone states:

" 'Date of issue,' when applied to notes, bonds, etc., of series, usually means an arbitrary date fixed as beginning of term for which they run, without reference to precise time when convenience or state of market may permit their sale or delivery, date which bonds and stocks bear, and not date when they were actually issued in sense of being signed and delivered and put into circulation."

However, in Whetstone, supra, a provision of the ordinance fixed the date from which the bonds were to bear interest. This provided the basis for holding the maturity date to be the date borne by the bond. In Yesler, supra, the bonds all had been prepared on one date. The contract with the purchaser required the coupons to remain intact from such date, although no bonds had been delivered, and same were not to be delivered for months.

It is our opinion this rule is without application in the instant case. "The constitutional provision (Sec. 35(b and d)) fixes manner of issuance and sale of bonds, and fixes the maturity date ' * * * after three (3) years from date of issues * * * '." There being no authorization within the constitutional grant or the ordinance involved, which might provide a different basis for fixing the anniversary date, the question is controlled by our prior decisions upon the question.

In Mistler et al. v. Eye et al., 107 Okl. 289, 231 P. 1045, the issue involved the asserted invalidity of a proposed bond issue alleged to contravene Sec. 26 of Art. X, because the amount of the issue exceeded the constitutional debt limitation upon the date bonds were authorized by the voters. In upholding validity of the bond issue the Court observed:

"[4, 5] When is the indebtedness incurred? Obviously, when the obligations by which the district is bound are issued and value received for them. There is no indebtedness until the money is received by the district. The money is not received until the bonds are issued, approved as required by law, and delivered to the purchasers."

■■■ In Coppedge et al. v. Depew Twp., Creek County et al., 109 Okl. 117, 234 P. 769, the syllabus states:

"Bonded indebtedness is incurred, within the meaning of section 26, article 10, of the Constitution, when the bonds of the township are voted, issued, approved, and delivered, and not when the election is held at which they are submitted. Mistler et al. v. Eye et al. [107 Okl. 289,] 231 P. 1045, not yet officially reported."

In McMasters v. Town of Byars, 203 Okl. 498, 223 P.2d 545, we reviewed the Mistler and Coppedge cases, confirming the result of those decisions by quotation of 64 C.J.S. Municipal Corporations § 1948, which text rule states:

"* * * In 64 C.J.S. Municipal Corporations, § 1948, p. 582, it is said: '* * * Bonds are issued, not when they are authorized or executed, but when they are delivered, that is, when the possession and control thereof pass from the municipality to the donee or purchaser or some person in whose hands they become a claim or charge against the municipality; even though executed, the bonds do not become operative and obligatory unless and until they are delivered.' "

To the same effect see McQuillen, Municipal Corporations (3rd Ed.), Secs. 43, 47 et seq., citing City of Madill v. Dabney, etc., 142 Okl. 92, 285 P. 832, holding *issuance* of refunding bonds *meant delivery to the creditor*.

■■■ As we interpret Const., Art. X, Sec. 35 (b and d), it is required that the first of any bonds which may be issued, in event of adoption of the proposed ordinance, must mature at some date three years, or later, after delivery of such bonds. Upon the authority of prior decisions, we hold the ordinance (No. 10051), which is proposed to be submitted to the qualified taxpaying voters of the City of Tulsa, to be defective and void as being in contravention of Const., Art. X, Sec. 35(d) as respects the fixing of a maturity date less than three years after date of issue.

Despite the conclusion just stated, we deem the public interest in this matter sufficient to justify consideration of other questions presented relative to validity and constitutionality of the City's proposed action.

■■■ Plaintiff next contends (Proposition VIII) the city intends to lease the land and facilities sought to be developed to private parties, although the city lacks authority under the charter to lease its property to private interests. The argument is that while the charter grants wide powers, and makes specific grants, no authority is given to lease city property and such power cannot be implied. This conclusion is predicated upon decisions which hold that powers of a municipal corporation must be construed strictly, and a city has only the powers granted, those impliedly (granted) and fairly incident to those expressly granted, or powers essential to the declared object of the municipality. See Y & Y Cab Service v. Oklahoma City, 167 Okl. 134, 28 P.2d 551. Hence, lacking authority under the charter to lease property and facilities intended to be acquired and developed from bond issue proceeds, the purposes of the bond issue cannot be ac-

·complished and the bonds will be issued for an unlawful purpose.

Art. II, Secs. 1 and 2 of the City's Charter in pertinent part states:

"1. The City of Tulsa, made a body politic and corporate by this charter, shall have perpetual succession, may use a common seal, may sue and be sued, *may contract and be contracted with* * * * may· take, hold and purchase land as may be needed for corporate purposes of the city, and may sell any real estate or personal property owned by it * * * may condemn property for public use, within or without the city, and may hold, manage and control the same * * *.

"2. * * * and provided further that the specifications of particular powers herein authorized shall never be construed as a limitation upon the general powers herein granted, it being intended by this charter to grant to and bestow upon the inhabitants of the City of Tulsa full power of self-government, and it shall have and exercise all powers of municipal government not prohibited to it by this charter, or by some general law of the State of Oklahoma, or by the provisions of the Constitution of the State of Oklahoma."

■ We consider this contention without merit in view of the grant of power continued in provisions of the charter above quoted, whereby the City is given the right to "contract and be contracted with". A lease is a contract between a lessor and lessee, which vests in the latter a right to possession of the land for a term of years and becomes an estate when it takes effect in possession. Howard v. Manning, 79 Okl. 165, 192 P. 358, 12 A.L.R. 819. The charter power granted to the City to contract with respect to property which it is authorized to take and hold includes the power to lease such property under the circumstances and for purposes herein disclosed. Also see Robinson v. Hal Johnson & Co., 206 Okl. 397, 243 P.2d 657.

Under Proposition IX it is ·urged that defendants are·prohibited by the City Charter (Art. II, Sec. 2, paragraphs 2 and 3) from becoming indebted for such purposes as proposed the Ordinance No. 10051. The paragraphs of the charter deal with the indebtedness which may be incurred by the city in any given year, and allows indebtedness above that specified by Const., Art. X, Sec. 26 for the purpose of purchasing or constructing public utilities to be owned exclusively by the city only· upon meeting stated conditions and requirements. Plaintiff says the charter provisions provide limitation upon defendant's power to borrow money by issuance of bonds; and this power is more restricted than the authority extended under Art. X, Sec. 35, which is permissive and imposes no duty upon the city or upon the citizens to vote such bonds. Thus, having adopted their charter, the people predetermined their debt limitation and the passage of permissive constitutional privilege neither abolishes nor affects same, which can be accomplished only by the people of the city imposing this upon themselves by exercising their right to amend the charter.

■ The grant of autonomy to cities of more than 2,000 population was extended under *Const.*, Art. XVIII, Sec. 3(a), subject to the condition that the charter adopted should be consistent with and subject to both the Constitution and laws of the State. The charter adopted by the city provides (Art. II, Sec. 1) in substance, that the grant of particular powers never shall be construed as a limitation upon the general powers granted. The intention of the charter was to grant to inhabitants of the city all concomitant powers of self-government not prohibited by charter, general laws of the State or by constitutional provisions.

■ The Constitutional amendment (Sec. 35) adopted by the people of the State must be considered a declaration that development of industry by permitting issuance of bonds was a matter of statewide concern. Being of statewide concern the general law, especially the Constitution,

must be considered controlling. The right of the people of the City of Tulsa to declare whether they shall attempt development of industrial endeavors by issuing bonds therefor arises by authority of the Constitutional amendment. This right cannot be circumscribed or divested by limitations in the city charter. We feel this question was settled in City of Sapulpa v. Land, 101 Okl. 22, 223 P. 640, p. 645, 35 A.L.R. 872:

> "The contention that cities operating under a freeholders' charter form of government have the power to determine what are purely municipal affairs, and, once having determined through the municipal legislative body legislating within the authority granted by the municipal charter, such matter is binding upon the state, is untenable. The fallacy of this contention is obvious. It is a well-settled principle of law that there can be but one sovereign power in the government of a state. As said by Mr. Justice Timlin in State ex rel. Mueller v. Thompson, 149 Wis. 488, 137 N.W. 20, 43 L.R.A. (N.S.) 339, Ann.Cas.1913C, 774, 'As well might we speak of two centers in a circle as two sovereign powers in a state.' This is fundamentally contrary to our form of institutions. Under our national and state organizations a municipal city government is only possible as an administrative agency of the state having that measure of local self-government granted by the supreme sovereign power, and all local laws of such municipality must be consistent with our fundamental principle of government, and always subject to the control of the state. State ex rel. Mueller v. Thompson, supra.

> "Under our form of government there can be no absolute self-governing American cities, no matter how limited as to subject. To hold otherwise would be to attempt to establish the impossible, a sovereign within a sovereign. * * *"

Also see Goodall v. City of Clinton, 196 Okl. 10, 161 P.2d 1011; City of Tulsa v. Sikes, 196 Okl. 306, 164 P.2d 863; State, etc. v. Dunnaway, 207 Okl. 144, 248 P.2d 232.

The holdings in the cited cases, and the conclusion reached herein, are not affected by the early decision in Brady v. Hubbard, 79 Okl. 210, 192 P. 567. This is for the reason that the action therein attacked, acquisition of land more than five miles outside the city limits, involved a matter of municipal concern, as to which the city charter was supreme so long as not in conflict with the Constitution. Inapplicability of such rule where the matter involved is of general concern, as in this case, is apparent without further discussion.

Complaint also is made (Proposition X) that the property to be acquired and developed is to be leased upon extended basis, under conditions whereby lease revenue will be inadequate consideration, and thus defendant will not have exclusive ownership as required by city charter, Art. II, Sec. 2, paragraph 3. This charter provision allows city to incur indebtedness in excess of both constitutional and charter limitations, where the indebtedness is incurred for the purpose of purchases, construction, or repair of public utilities *to be owned exclusively by said city*.

It is argued there is no assurance anticipated lease rentals adequately will compensate the city for the investment. Thus this proposal amounts to nothing more than conveyance of equitable ownership of the property, which constitutes violation of the charter provision requiring exclusive ownership. Since this creates a direct conflict between charter limitations and the authority granted the city under Art. X, Sec. 35, any bonds issued for the purposes proposed will be violative of the charter provisions.

We are of the opinion this argument was effectively foreclosed in Meder v. City of Oklahoma City et al., Okl., 350 P.2d 916, cited by defendants. Our decision in that case obviates the need for extended

discussion. Additionally, however, we note that the constitutional authorization of Art. X, Sec. 35 fixes no absolute obligation that the participating city retain both legal and equitable title, which would be required in order to retain exclusive ownership.

 Proposition XI raises the question that the language of Sec. 35 is so broad the meaning is unascertainable and same therefore is unenforceable. Proposition XII urges the amendment (35) does not include authority for the city to acquire land and construct the proposed facilities. The arguments advanced in support of the two propositions have been concluded by the decision in McVickers v. Zerger et al., Okl., 389 P.2d 977. Having judicially determined the amendment to be self-executing this would appear also to be a determination as to clarity and capability of interpretation. The Act therefore must be held enforceable in order to carry out the manifest purpose of the people in adoption of the amendment. The clear authorization for the city to proceed under Sec. 35, where properly authorized by the qualified taxpaying voters, necessarily imparts the right to acquire land and construct facilities thereon in order to develop industry. In Palmer v. Town of Skiatook, supra, we cited Reid v. City of Muskogee, 137 Okl. 44, 278 P. 339, to the effect that motives of public officials and electors are not proper subjects of judicial inquiry in an action such as this.

 Proposition XIII urges the proposed development constitutes a utility, and the proposal thus is defective in that it specified same will be financed under Sec. 35, rather than under Sec. 27 of Art. X. Admittedly, adoption of Sec. 35 did not repeal Sec. 27. Both stand alone and are to be interpreted as complementary of one another. However, the clear intent of the people in adopting Sec. 35 was simply to supply an additional means for financing the type of public endeavor contemplated. It is not required that a proposed utility be financed under the constitutional plan permitted under Sec. 35. The same result

could be achieved under Sec. 27. Both constitutional methods require approval of the people, but Sec. 35 provides two additional benefits. The bonds issued under the latter authority are permitted to be issued for and funded over a longer period of time. And, the two separate purposes, acquisition of land and construction of industrial parks facilities, may be accomplished in a single combined bond issue which offers economic advantages to the taxpayers. We are of the opinion the adoption of Sec. 35 extended to the city an additional means to construct public utilities under a plan of industrial development coming within the purview of such section. And, where properly submitted for approval of the people, a city may resort to either plan of financing now permitted under Const., Art. X, Secs. 27 and 35.

Propositions XIV and XV present the argument that the land acquisition and construction of the proposed facility is not "near" the City of Tulsa as required by Sec. 35 of Art. X; and that the entire facility will be in Rogers County, of which the City is not a part, and the defendant thus lacks authority under Sec. 35 to levy taxes which will be expended entirely in Rogers County.

 The land to be acquired and the facilities to be constructed will be more than 7 miles from the city limits and entirely in Rogers County. It is urged these circumstances defeat the requirement of Sec. 35 that such facilities be "near" the City. Definition of the word "near" in 65 C.J.S. p. 264 states, as applied to space, that this is a term of relative signification without positive or precise meaning and locates nothing with any degree of precision. In Sigman v. Newton County, 168 Ga. 122, 147 S.E. 586, when considering "near" with respect to location of a highway, that court referred to "near" as being a relative term, the precise import of which can be determined only by surrounding facts and circumstances.

In Fall River Iron Works Co. v. Old Colony & F. R. R. Co., 1862, 5 Allen 221,

87 Mass. 221, that court observed that as applied to space "near" can have no precise or positive meaning. It is a relative term, depending for significance upon the subject matter in relation to which it is used and the circumstances under which it becomes necessary to apply it to surrounding objects. It may be used to approximate distances which of themselves differ widely. And, in City of Nashville v. Vaughn, 158 Tenn. 498, 14 S.W.2d 716, it was pointed out that "near" had a meaning wholly different from bygone days, due to wholly different facilities for transportation and movement generally. Also see State, etc. v. Board of Commissioners, Kearney County, 146 Kan. 461, 72 P.2d 67. We hold the proposed industrial development to be "near" the City of Tulsa within the meaning and intent of Sec. 35 of Art. X.

■■■■ The language of Sec. 35 apparently intended that when a bond issue was adopted by a county, expenditures should be limited to the county. No such limitation is found in the constitutional amendment as respects cities. We take judicial notice of the fact that part of the City of Tulsa lies within the boundaries of Osage County. Likewise, the city's water supply was acquired and constructed by means of bond revenue expended outside the city, and in other counties not contiguous to Tulsa County. We hold that the expenditures contemplated under the proposed development properly come within the requirements of Sec. 35, which is to be accorded a practical construction to carry out the plain purpose manifested by adoption of such section. Neither the language of Sec. 35, nor the purpose for which adopted, require the city's expenditure of bond issue funds to be limited to development within the county. Also see Ramsey v. Leeper, 168 Okl. 43, 31 P.2d 852.

Plaintiff further contends (Proposition XVI) the purposes for which the bonds are to be issued cannot be accomplished without exercise of the power of eminent domain, and the City has no power to exercise eminent domain to acquire land for such purposes outside the City and entirely in Rogers County. The argument is that the proposed use is a private use and the City therefore is prohibited by Const., Art. II, Sec. 23, from condemning private property. Further, even should this Court declare the proposed development to be for a public use, the City still lacks specific legislative grant of the power of eminent domain for the purposes contemplated herein.

Already having determined the acquisition of land and construction of the water port and related industrial park as proposed by Ordinance 10051, to be for a public use, it is unnecessary to discuss this issue further, or to multiply the authorities which support our holding.

■■■■ As respects plaintiff's argument relative to the city's asserted lack of the power of eminent domain, it is noted that legislative grant of the power is extended to cities under these statutory provisions: 27 O.S.1961, § 5; 11 O.S.1961, § 563; 11 O.S.1961, § 670. However, 11 O.S.1961, § 563 expressly extends authority for a municipal corporation to exercise eminent domain within or without the corporate limits for the purpose of acquiring, owning and maintaining sites and rights-of-way for public utilities. Having considered and determined that the proposed facility is a public utility within the meaning and authority of past decisions, it follows that the City is clothed with authority to exercise the power of eminent domain outside the county to acquire the land needed for the proposed development. Delfeld v. City of Tulsa, supra; City of Tulsa v. Williamson, supra; and Ramsey v. Leeper, supra.

Plaintiff's final contention (Proposition XVII) is that the entire proposal is so speculative, in that the entire project may be suspended by congressional failure to appropriate funds for completion, or that the proposed canal will be stopped at some point below the Port of Catoosa. Thus if the project should be stopped, the city's expenditures would be wasted, or if the canal is not completed on schedule (1970) the facilities created by expenditure of

bond funds would be wasted. The proffered conclusion is that the city's proposal is not the character of industrial development contemplated by Const., Art. X, Sec. 35. Alternately, plaintiff suggests should we consider the proposal proper under Sec. 35, then this Court should require defendants to delay the entire program of development until the Arkansas River canalization project is completed at the Port of Catoosa.

It is within public knowledge that vast amounts have been expended toward completion of the Arkansas River program. The projected work is being carried toward completion daily under current fiscal appropriations. An integral part of the entire development was the requirement that local authorities should make provision for the facilities which are contemplated under the present bond proposal. To meet this requirement the City committed itself in 1945 to such a program. Particularly in view of the fact the entire project is half complete, this argument must be considered speculative.

Acceptance of such argument would have prevented the action of the city proposed in Delfeld, supra, to condemn land for the airport, since contemplated the war would end and the Federal Government no longer would require the proposed bomber plant. Stated in another manner, this contention presents nothing more than the claim that a permanent foundation should not be planned until first determined whether the roof may leak. The need for increasing the capacity of the Spavinaw water supply, and the expenditure of public funds for such purpose, would not have arisen had the project been deferred until it could be determined whether justified by population growth and industrial development. Plaintiff's argument provides no ground for enjoining the proposed development.

In view of the conclusions reached, we hold the proposed acquisition and development to be for a public use, and that the City is authorized to exercise the right of eminent domain in completion of the proposed project in the event same is approved by the taxpaying voters of the City when the proposal is submitted properly.

The issues presented and considered are of a public nature and of extreme importance to municipalities of the State. As stated in Meder v. City of Oklahoma City, our holding should be considered both advisory and directory. We conclude no insurmountable legal obstacles appear which require granting the relief sought by plaintiff, conditioned upon the premise the defendants proceed in accordance with the views herein expressed.

HALLEY, C. J., and JACKSON, V. C. J., and DAVISON, WILLIAMS, BLACKBIRD, IRWIN, BERRY and HODGES, JJ., concur.