**RURAL WATER DISTRICT NO. 3, PUSHMATAHA COUNTY, OKLAHOMA, Appellee,**

v.

**ANTLERS PUBLIC WORKS AUTHORITY, Appellant.**

**No. 79557.**

Court of Appeals of Oklahoma, Division No. 1.

Nov. 23, 1993.

Jay M. Galt, Robert V. Varnum, White, Coffey, Galt & Fite, Oklahoma City, for amicus curiae, Oklahoma Rural Water Ass'n.

## MEMORANDUM OPINION

JONES, Presiding Judge:

Appellant, Antlers Public Works Authority ["Authority"], seeks reversal of judgment rendered by the trial court following a nonjury trial. The trial court reduced Authority's requested increase in rates for water which Authority supplies to Appellee, Rural Water District No. 3 of Pushmataha County ["District"]. Authority contends a provision of its contract with District was constitutionally or statutorily infirm, and the trial court's judgment resulted in a constitutionally proscribed taking without just compensation. We disagree, and so affirm the trial court's judgment.

Authority was established as a public trust under 60 O.S.1961 § 176 in 1962 by the Town of Antlers. The town then leased its water plant to Authority for a term of 40 years. The lease provides that the Authority

will fix a uniform and non-discriminatory rate or rates, fees, costs and rentals and charge and collect same for the services supplied by and the use of the facilities of the Trust Estate, which rates, fees, costs, and rentals shall at all times be at lease [*sic*] adequate to provide revenues sufficient in amount to assure that there will be enough revenues to meet interest, principal and reserve requirements on the bonds issued by the authority pursuant to the Bond Indenture ... and all operation, maintenance, renewal and replacement expenses, and providing adequate reserves for all of said purposes.

[Plaintiff's Exhibit 3 ("Lease"), Art. IV § 1, at p. 2.]

In 1969, Authority executed a standard form contract[1] to sell water to the Rattan–Moyers Water District, predecessor to Appellee District. The contract provided that water rates could be modified every two

Jerry Otis, Stamper, Otis & Burrage, Antlers, for appellant.

James Branam, Dennis & Branam, Antlers, for appellee.

1. The form contract was one used by the United States Department of Agriculture Farmers Home Administration. The rate modification provision at issue here is part of the printed form.

years, to reflect demonstrated increases or decreases in the cost of supplying water:

C. It is further mutually agreed between the Seller and the Purchaser as follows:

\* \* \* \* \* \*

5. (Modification of Contract) That the provisions of this contract pertaining to the schedule of rates to be paid by the Purchaser for water delivered are subject to modification at the end of every 2 year period. *Any increase or decrease in rates shall be based on a demonstrable increase or decrease in costs of performance hereunder, but such costs shall not include increased capitalization of the Seller's system.* Other provisions of this contract may be modified or altered by mutual agreement.

[Plaintiff's Exhibit 1, Water Purchase Contract ("Contract"), p. 3, emphasis added.]

The original contract set the water rate at 35 cents per thousand gallons. The Contract was amended several times to increase the rate and the maximum quantity of water to be delivered. The present case involves Authority's request in 1991 to increase the water rate from 85 cents per thousand gallons to $1.10 per thousand gallons. Following Authority's initial proposal to that effect, District refused to pay the increased rate. Authority then threatened to cutoff District's water. District sued for declaratory judgment that the proposed increase violated Paragraph C.5 of the Contract, and successfully obtained an injunction to prevent Authority from cutting off the water.

Authority then filed a counterclaim against the District. Authority alleged Paragraph C.5 of the contract was unconstitutional under Art. 10, § 17, of the Oklahoma Constitution, which states:

The Legislature shall not authorize any county or subdivision thereof, city, town, or incorporated district, to become a stockholder in any company, association, or corporation, or to obtain or appropriate money for, or levy any tax for, or to loan its credit to any corporation, association, or individual.

Specifically, Authority argued that the restriction in Paragraph C.5 prevented Authority from recovering all of its production costs, effectively resulting in an unlawful loan or subsidy for the District's water purchases.

The dispute in this case as framed by Authority's petition in error turns primarily on whether Authority could legitimately include depreciation of a water plant built in 1975 in its calculation of costs. District's expert testified that in his opinion the construction of the new water plant was an "increase in capitalization," and that the depreciation expense related to the plant should not be included in figuring "cost of performance" under the water purchase contract.

District's position on the capitalization issue was also based on the fact that there was no outstanding indebtedness on the water plant's $1.2 million cost. Just over half of that amount ($650,000) came from a grant, while the remainder had been paid off before the 1991 rate increase request.

■ The constitutional provision at issue here was intended to prevent public investment in private enterprises. *Lawrence v. Schellstede,* 348 P.2d 1078, 1082 (Okla.1960); *see Willow Wind, Inc. v. City of Midwest City,* 790 P.2d 1067, 1070 (Okla.1989). Professor Merrill once wrote that the section was intended to prevent "some of the grosser forms of raids on public money perpetuated in the earlier history of this country." M. Merrill, *"The Constitutional Rights of Oklahoma Cities,"* 21 Okla.L.Rev. 251, 260 (1968).

The few reported cases suggest that any public purpose associated with a municipal expenditure will ordinarily defeat a claim of constitutional infirmity under Art. 10, § 17. *See Sublett v. City of Tulsa,* 405 P.2d 185, 187 (Okla.1965) (ordinance authorizing bond issue for Port of Catoosa not unconstitutional even though port facilities might be used only by limited types of commercial interests, or might be leased to private interests for industrial development); *see also Burkhardt v. City of Enid,* 771 P.2d 608, 611–12 (Okla. 1989) (municipal purchase and leaseback of university facilities as part of economic development initiative did not violate Art. 10, § 17, merely because the lease was at a lesser rate than comparable commercial properties).

*But see State ex rel. Lacy v. Jackson,* 682 P.2d 218, 220–21 (Okla.1983) (city can not pay to publish privately-owned newspaper).

■ Here, we are faced with a question of benefit to the rural water district at the expense of the other users of water from the Antlers water plant. However, District is not a private "corporation, association, or individual." Rather, it is a public, non-profit corporation established to assure adequate water supply for the residents of the rural area it serves. *See* 82 O.S.1963 Supp. §§ 1302(a), 1303 (repealed; *see now* 82 O.S. 1991 §§ 1324.2(1), 1324.3). Even if we accepted Authority's position that the water rates as fixed by the trial court amounted to an appropriation of funds or extension of credit to District, we find a sufficient public purpose inherent in the nature of a rural water district and the in the salutary purposes it serves that Art. 10, § 17 is not offended. We therefore reject Authority's proposition of error on this point.[2]

■ We can also quickly dispose of Authority's contention, raised for the first time on appeal, that the *trial court's judgment* has resulted in a taking of its property without due process of law, in violation of Okla. Const., Art. 2, § 7. Authority's failure to raise a due process argument in the trial court is not fatal, *Pettit v. American National Bank of Austin,* 649 P.2d 525, 529 (Okla. 1982), but Authority has failed to make any cogent argument in support of this proposition of error.

■ The due process provision in our constitution does not create a cause of action for deprivation of constitutional rights whenever a trial court may have misconstrued the law or committed some procedural error. We are quite satisfied that the process by which the trial court rendered its decision was fair (to be sure, Authority has not shown otherwise), and that is all due process requires. *Accord, United States v. Wallace,* 448 F.Supp. 164 (E.D.Va.1978); *Grant, Schon, Wise & Grant, P.C. v. R.W. Borrow-*

*dale Co.,* 114 Ill.App.3d 89, 69 Ill.Dec. 856, 448 N.E.2d 574 (1983).

The evidence at trial indicates sharp disagreement about whether or not depreciation "expense" is or is not a proper factor to be considered in fixing the water rate, given the Contract's restriction in Paragraph C.5 that "increased capitalization" should not be taken into account when the rates are changed. District's accounting expert testified in his opinion, the Contract forbade consideration of depreciation expense. He suggested this was particularly appropriate in view of the absence of debt associated with the municipal water plant. On the other hand, Authority's expert testified that, *for purposes of a financial statement,* inclusion of depreciation expense would reflect more accurately Authority's total expenses, and net income or loss from its operations. Although the question was *never directly put to him,* we assume Authority's expert would also have opined that including depreciation in a determination of water rates under the Contract is consistent with the Paragraph C.5's prohibition on figuring cost of performance without regard to "increased capitalization."

The substantive evidence on costs varied widely. District's accountant calculated the cost of production, even with the depreciation expense added, as between 83 and 86 cents per thousand gallons. Memoranda and correspondence from the Town Administrator of Antlers put the cost of production at 94 to 98 cents per thousand gallons, including the depreciation expense. Authority's accountant testified the cost, including depreciation, was $1.07, while disregarding depreciation the cost would be only 62 cents per thousand gallons.

■ Given these disparities in the evidence, we cannot say the trial-judge's decision fixing the rate at 98 cents per thousand gallons was unsupported by the evidence, or inconsistent with the terms of the Contract. The evidence shows that all of Authority's "actual" costs of production, and a virtually

---

**2.** The evidence also reveals that Authority possesses the only nearby source of water available to District. At the time of the 1991 rate increase requested by Authority, District's purchases under the Contract accounted for almost half of the volume of water produced by the Antlers water plant.

all of its total costs (i.e., including depreciation expense) would be covered by the 98 cent per thousand gallons rate determined by the trial court. The trial court's findings will not be reversed where there is any competent evidence to support them. *Tax/Investments Concepts, Inc. v. McLaughlin,* 670 P.2d 981, 983 (Okla.1982).

The trial court's judgment is free from error, and is therefore AFFIRMED.

HANSEN, C.J., concurs.

ADAMS, J., concurs in result.